1  DANIEL A. HOROWITZ State Bar No. 92400

2  Attorney at Law
   P.O. Box 1547

3  Lafayette, California 94549

4  (925) 283-1863

5

6
   Attorney for Plaintiff

7

8

9

10            *UNITED STATES DISTRICT COURT*

11            *NORTHERN DISTRICT OF CALIFORNIA*

12

13

14  MICHAEL SAVAGE,
    aka (Michael Weiner)

15                                    No.  C 07-06076SI

16            Plaintiff,

17
    vs.

18

19  Counsel on American-Islamic
    Relations, Inc.,  Council on

20  American Islamic Relations
    Action Network Inc., Council on

21  American Islamic Relations
    of Santa Clara Inc., and Does

22  3-100

23

24
              Defendants.

25  _____/

26

27            **2nd AMENDED COMPLAINT FOR DAMAGES**

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# FIRST CAUSE OF ACTION
(Trademark Infringement)

**THE PARTIES**

### 1.

Michael Weiner is the radio show star of The Michael Savage Show" where he uses the name "Michael Savage".  He is hereinafter referred to as "Michael Savage" as this is the name used in the public arena.  Michael Savage is the owner of copyright interests in his show, "The Michael Savage Show" also known as "The Savage Nation".

### 2.

"The Savage Nation" is a nationally syndicated radio show that reaches over eight million listeners per week. Related to that show is the website www.MichaelSavage.com which receives 2.3 million page views per month.  The radio show originates in San Francisco, California.

### 3.

"The Savage Nation" is unique among so-called "Talk Radio" in that it combines serious intellectual analysis with dramatic and emotional soul baring that the show advertises as "Psychological Nudity".  This performance aspect of the show is critical in that it conveys an emotional power and a fundamental honesty to the programming that is meaningful to the listening audience.

### 4.

There are segments of the show that are as lyrical and as emotionally powerful as live theater, poetry, rap music or other genres where a performer

combines social commentary with powerful performance.  In fact the start of show always begins with the admonishment:

> "Warning: This show contains adult language, adult content,
> psychological nudity. Listener discretion is advised."

5.

Those millions who continue to listen understand that they are hearing radio that is as cutting, raw, emotional and fundamentally honest as any programming that has ever existed on the airwaves.

6.

Defendants are part of a deliberately complex and deliberately confusing array of related organizations which in general operate under the name "Council on American Islamic Relations" aka "CAIR".    In fact, these names are often modifications of the true name of the corporate entities.

7.

The originally named defendant in this lawsuit is the Council on American Islamic Relations aka CAIR.  Such a group exists in Texas and has been served as being the same Council on American Islamic Relations aka CAIR as is involved in the actions alleged herein.  This group despite being one of the few "CAIR" groups having the name "Council on American Islamic Relations" is paradoxically not named as a Chapter of the group on the website that purports to be that of the very same Council on American Islamic Relations aka CAIR.

8.

This particular "CAIR" group is headquartered in Garland, Texas.  During the years 1998 and 2001, at least three members of the board of directors of the Holy Land foundation were from Sherman, Richardson and Garland, Texas.

Richardson, Texas is less than 10 miles from Garland.  The same Ghassan Eliashi who is a member of the board of the Holy Land Foundation was also a founder of the CAIR group in Garland, Texas.

9.

The self-proclaimed leaders of the Council on American Islamic Relations aka CAIR operates out of Washington, D.C. and where the actual name of the corporation is Council on American Islamic Relations Action Network aka CAIR. Therefore, Doe 2 is named herein as the  Council on American Islamic Relations Action Network, Inc. aka CAIR.  However, in its IRS Form 990 filing in 2005, the group used the corporate name, Council on American Islamic Relations and not Council on American Islamic Relations Action Network. In the alternative, Doe 2 is sued under the name "Council on American Islamic Relations Inc." This entity is intended to be the group that is headquartered in Washington D.C. and which is commonly referred to as "CAIR-National."

10.

The copyright infringing audio segment is contained on a website which purports to be that of the organization CAIR.  The website address is www.cair.com.   Www.cair.com is owned and controlled by Doe 3, Council on American Islamic Relations of Santa Clara, Inc. The content of the website consistently relates to the activities Washington, D.C. based Council on American Islamic Relations Action Network but it never refers to any corporate name. Therefore, plaintiff has added the Santa Clara based "CAIR" group as a defendant.

11.

Plaintiff alleges that each of the named defendants, others unknown and Does 3-100 acted in concert and in conspiracy to accomplish the matters set forth in the complaint.

**FIRST AMENDED COMPLAINT**
**SAVAGE v. CAIR**                                         3

1

12.

2

Plaintiff further alleges that the decentralized organizational structure, the

3

shared use of the name CAIR and the substitution of the name Council on

4

American Islamic Relations for the proper name of the District of Columbia based

5

group, Council on American Islamic Relations Action Network is part of a plan

6

and design created to cause confusion and to hide the actual relationships between

7

the entities.  When alleging actions taken in support of the conspiracy, CAIR is

8

referred to generically (as "CAIR").  If the actions of a specific subgroup are

9

particularly relevant, the individualized entity will be identified.

10

11

13.

12

This organizational structure is part of the scheme to hide the illegal

13

activities of the group, funding, the transfer of funds and to complicate

14

investigation of the organization

15

14.

16

This cell type structure creates problems for law enforcement and others to

17

trace the activities of the organization.  It is part of the overall plan of defendants

18

and each of them to avoid detection of their funding and to avoid detection of the

19

nature and scope of their activities.

20

21

15.

22

This same confusion and deception has been used by the Council on

23

American Islamic Relations Action Network in the United States District Court.

24

In No. 3:04-CR-240 in the United States District Court, Northern District of

25

Texas, Dallas Division, (before the Honorable A. Joe Fish, District Judge),

26

defendant filed a pleading using the name Council on American-Islamic Relations

27

("CAIR") when in fact it appears that the actual group name is the Council on

28

**FIRST AMENDED COMPLAINT**
**SAVAGE v. CAIR**                    4

1    American Islamic Relations Action Network.

2

3                                16.

4        In a brief filed in that action titled, "AMICUS CURIAE BRIEF OF THE

5    COUNCIL ON AMERICAN-ISLAMIC RELATIONS IN SUPPORT OF THE

6    UNINDICTED CO-CONSPIRATORS' FIRST AND FIFTH AMENDMENT

7    RIGHTS", CAIR stated:

8        "NOW COMES, the Council on American-Islamic Relations

9        ("CAIR"), by and through its undersigned counsel, respectfully

10       submitting this Amicus Curiae brief in opposition to the public

11       issuance of the unindicted co-conspirator list and seeking the Court to

12       strike their name from the list, along with the names of all other

13       unindicted individuals and organizations, and take any other action

14       that it deems to be appropriate."

15                               17.

16       The brief appears to be on behalf of the Washington D.C. based Council on

17   American Islamic Relations Action Network as the brief contains the following:

18       INTEREST OF THE AMICUS CURIAE

19       The Council on American-Islamic Relations ("CAIR") is America's

20       largest Islamic civil liberties group, with regional offices nationwide

21       and in Canada and national headquarters on Capital Hill in

22       Washington, D.C. CAIR is a nonprofit, grassroots civil rights and

23       advocacy group, which was established in 1994 ...

24                               18.

25       As the Texas Corporation originally sued herein as Council on American

26

27

28

**FIRST AMENDED COMPLAINT**
**SAVAGE v. CAIR**                    5

Islamic Relations was formed in 1998 and the Council on American Islamic Relations Action Network out of Washington D.C. was formed in 1994, plaintiff alleges that the confusion of names is part of a pattern and practice by defendant and that such deception has been perpetrated on the United States District Court in Texas.

19.

The deception is so pervasive that Attachment A to the government's trial brief in the above action, listed the organization as the Council on Islamic American Relations aka CAIR.   This confusion was not corrected and in fact was repeated in the documents prepared by "CAIR" in the public (PACER) file in that action.

20.

The groups of organizations and individuals acted in conspiracy with and in cooperation with each other, acting under the umbrella of "CAIR" are referred to herein as "CAIR".   Defendants named herein as Does 3-100 are defendants whose true names and capacities are presently unknown.  When the names and identities of said Does are ascertained, this complaint will be amended to reflect the same. These Doe defendants include persons and entities that have conspired with CAIR to violate the rights of plaintiff as set forth herein.

**JURISDICTION**

21.

This lawsuit raises a federal issue arising out of federal statute (copyright infringement and RICO violations).  In addition, the CAIR group most directly associated with the operation of the website that is at the core of the copyright infringement case, is a Santa Clara based organization.  The "CAIR" website

**FIRST AMENDED COMPLAINT**
**SAVAGE v. CAIR**                                   6

owned by this group lists this as the "San Francisco Bay Area" chapter of CAIR. San Francisco and Santa Clara, California are within the jurisdiction of the United States District Court, Northern District of California.  Further, the CEO of the Santa Clara based group is on the "national board" of the entity that identifies itself as the Washington, D.C. based group.  Finally, the founder of the Washington DC based CAIR served on the Board of Directors of the Santa Clara based CAIR in 1998, 2000, 2001 and perhaps in other years as well.

22.

Michael Savage broadcasts out of a studio and at a radio station located in San Francisco, California.

**COPYRIGHT INFRINGEMENT**

23.

This lawsuit concerns the infringement of the copyright to the October 29, 2007 show wherein a dramatic, meaningful and powerful segment of the Savage Nation was and continues to be expropriated by defendant, CAIR (as identified herein).   This expropriation is both a continuing act of copyright infringement as well as a racketeering act as set forth herein but more fully in the Second Cause of Action.  The Second Cause of Action is incorporated herein by this reference.

24.

The segment misappropriated was in excess of four minutes.  As set forth in more detail herein, the misappropriated segment was used by CAIR for fund-raising purposes and the segment was used in a manner designed to cause harm to the value of the copyright material in the long and short term.  This was the desired result and it was part of a greater plan and scheme to destroy public voices

that express opposition to the criminal political agenda of CAIR as set forth more fully in the Second Cause of Action. (The allegations of the Second Cause of Action are incorporated herein by this reference.)

25.

CAIR is not a civil rights organization and it never has been.

26.

At all times relevant herein, CAIR was and is a political organization that advocates a specific political agenda on behalf of foreign interests.

**COPYRIGHT INFRINGEMENT AS A TOOL TO ATTACK FREE SPEECH, PROMOTE A TERRORIST AGENDA AND FOR OTHER "NON FAIR USE" PURPOSES**

27.

CAIR has misappropriated copyright protected material from Michael Savage and made this material available on its website.   This is actionable regardless even if CAIR had a genuine charitable purpose in using Michael Savage's material.  However, even genuine charities must gain the permission of a copyright holder before using the copyrighted work for fund raising or other purposes.

28.

The CAIR misappropriation was done for political purposes unrelated to civil rights and unrelated to CAIR's tax exempt status.

29.

The copyright infringement was done to raise funds for CAIR so that it could self perpetuate and continue to perform its role in the RICO conspiracy set forth in Count Two and to disseminate of propaganda on behalf of foreign

interests that are opposed to the continued existence of the United States of America as a free nation.

30.

CAIR repackaged the content of Michael Savage's show and manipulated that stolen content so that it could be used by CAIR to raise funds. Little or none of the money raised went to alleged "civil rights" activities.

31.

The CAIR repackaging damaged the work and damaged the public image of the work because it was taken out of context, the introductory remarks were omitted and the context of "The Savage Nation" were removed. It was deliberately designed to obscure the specific message conveyed by Michael Savage. The actual message while highly provocative and strongly worded, was not intended as an attack on people of faith and in fact, Michael Savage is well known as a person of faith.

32.

The stolen material as repackaged by CAIR was intended to portray both the material and the creator of the material, Michael Savage as having a blanket opposition to a particular religion. This was not the context of the statement and it is not consistent with the content of the programming as a whole.

33.

In fact, Michael Savage has presented various views and various perspectives. The purpose of his show (among other purposes) is to present uncensored, genuine points of view that force listeners to both think and feel in ways that normal polite discourse may not allow. The CAIR misappropriation

omitted this reality about the show and therefore failed to incorporate the context of Michael Savage's many comments which include praise for the aspects of non-violent Islam that create a high level of morality and family values.

34.

CAIR knew or should have known that it was misportraying the views of Michael Savage as the following are just some of the positive positions taken by Michael Savage with respect to people who use their religion to promote morality, freedom and family values.   As noted herein, Michael Savage makes no distinction among religions in these comments.  These comments include but are not limited to the follows:

CALLER:    Hi Dr Savage, thank you for taking my call. I'm a Muslim, I'm originally from Turkey and I've been in this country since 93.  I've been listening to your show for the last 3 years, and 80% I support what you're saying, I believe in American values. My religion is Islam, my question to you is can I be a Muslim and still support American values in this country.

SAVAGE:    Sure you can, absolutely. That's what I said all along. Look, it's like saying can I be a Jew and still support American values, can I be a Buddhist and still support American values, can I be a Hindu can I be an Atheist, Yes that's what America is all about. It's freedom of religion, and freedom to be non religious.  That's what makes the country great, it's freedom. So I don't understand where the problem exists.

SAVAGE:    In other words, everybody knows no matter what their religion is, even an atheist knows it's not right to take a penny out of another man's pocket that's not yours right?

CALLER:    Right

SAVAGE:    Ok, so you start with that basic knowledge, the basic rules of living with people can be boiled down to do unto others as you would do onto you, or do onto others as you would have them do to you. That's the essence of every religion.

(Date of Show: 3/27/07)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SAVAGE:    There are areas of unity between the religions and I think we need to strengthen those. We need to strengthen those areas of unity. Maybe this IS a radio show that can help do that. Mohammed from Orlando, welcome back to the program. Now, you heard the Rabbi from New York and his views of Evolution and Creation you agree with?

CALLER:    Yes, and that's what Islam is definitely all about. When I was listening to his message or his … he uh, uh, has a great way of articulating the words that he was, uh, telling on this conversation. That, um, the way we were created and everything else, that's exactly, I think, there's a lot of similarities between all religions, Christianity, Judaism, and Islam.

SAVAGE:   But yet, many Christians call the show and they don't believe in Evolution. They believe only in Creation. Are there… um… Creationists within the Muslim tradition as well who reject Evolution? I would think that the educated Muslim understands that you can have science and religion co-existing.

CALLER:   Definitely. Without science, I don't think we actually can basically survive. And the word, the first word that came out when revelation came in upon the Prophet Mohammed, peace be upon him, is "read," which is basically a way of telling human beings to take themselves and educate themselves and go into areas of things like science and like I said, that's the first thing that Muslims are encouraged to do is basically educate themselves. So, I don't see there is a difference between… a lot of people when they hear "Evolution," they take it to the extreme that we all came out from apes or from another animal or some other beings, but that's not how evolution is. So, evolution could be something that, um, basically, where, where, um…

SAVAGE:   Well, I had asked the Rabbi yesterday how do you explain the previous, uh, pre-humans, for example. Let's call them that. The Neanderthal, for example. How do you explain that? If God is perfect, why would He create an imperfect man before creating a perfect man? And his answer was very interesting. He said that God took a long time to arrive at man to teach us how much time and effort it takes to create even one man in order to show us how important life is and the divinity of mankind. I

thought that was beautiful, didn't you, Mohammed?

CALLER:    Definitely and also, uh, in Islam, way before humans were created, there was another creature that walked on the earth, and that's another creature which we call the Djinns. And the Djinns actually, they were living in Earth way before we came in and they did exactly the same thing that we're doing right now. We're shedding blood all over the place. And God, when he told the angels that he will create humans, the angels replied to him that you will create a human just like you did with the Djinns. And they will do exactly the same thing that the Djinns did. And He said, I know that, but I know more than you will. So that's exactly the same way. So there's a lot of creatures that…

SAVAGE:    So in other words, we're still behaving like sub humans even though we're humans.

CALLER:    Exactly

SAVAGE:    And we're not supposed to behave like that. We're supposed to behave like the angels, but we're still behaving worse than the ape.

CALLER:    Definitely.

SAVAGE:    [Laughter] Mohammed, bless you. Alechem Salam. Thanks for listening to The Savage Nation.

**FIRST AMENDED COMPLAINT**
**SAVAGE v. CAIR**                    13

1

2

Date of Show: 11/29/06

3

35.

4

5

These misportrayals were done to deliberately increase the profit making

6

aspects of CAIR's misappropriation and to further the illegal purposes of the

7

organization.  The misportrayals were done to silence people who oppose the

8

commission of acts of violence, murder or torture under the guise of religion.  By

9

omitting Michael Savage's strong endorsement of all religions and all religious

10

practice that supports moral values, family values and freedom, CAIR destroyed

11

the value of the copyright material and the performance as a whole, at least to the

12

extent that people gave credence to the CAIR packaging of the content.

13

36.

14

To further promote their website, fund raising and the appearance of a

15

genuine human rights agenda, CAIR organized contacts with various advertisers

16

17

including Walmart, AutoZone, JC Penny and others whereby CAIR sought to

18

convince them not to advertise on The Michael Savage Show.   Any success in this

19

area was due to the copyright infringement and the false context in which the

20

material was presented.  CAIR caused some advertisers to pull advertising but they

21

also made false claims as to many other advertisers.  These false claims were done

22

in part to intimidate other talk show hosts.

23

37.

24

In its actual context, the piece was directed toward violent terrorists who

25

mask their personal evil with a false religious aura.  This included the "Hitler of

26

Iran" (Mahmoud Ahmadinejad).   Michael Savage's show in its introduction

27

promises "psychological nudity".   Savage's outrage and strong language

28

**FIRST AMENDED COMPLAINT**
**SAVAGE v. CAIR**                    14

objecting to the murder of homosexuals and the mutilation and oppression of women under the guise of religion makes much more sense than the CAIR packaged spin that Savage who has repeatedly taken pro-faith views was somehow against a particular religious group in its entirety.

38.

The audience of "The Savage Nation" expects this type of from the heart outrage and when it is directed at a murderer such as Mahmoud Ahmadinejad and his ilk, the piece is far more understandable and far more American mainstream. While the strength of the outrage is remarkable and a hallmark of "The Savage Nation",  the sentiment is shared by a huge number of Americans.

39.

The copyright material properly viewed is a scream of outrage on behalf of the American public against beheadings, hangings of homosexuals, mutilation of women, the torture of rape victims and the thought that CAIR and other groups are trying to import these atrocities into American life.

40.

Just as all religions are free to practice in the United States, Michael Savage is free to exercise his beliefs without having someone in the opposition steal his property and convert it for their own use.   The violation of the copyright and the desecration of that copyright material is a violation of the freedoms of Michael Savage to express his views.

41.

Michael Savage has analogized his statements on the radio to those made by Winston Churchill when he warned of the rise of the Nazis.   Michael Savage has pointed out that all Germans were not Nazi's and Churchill's words if heeded

would have protected the German public as well as the rest of the world.   To steal his words and repackage them is to steal the intellectual and emotional property of Michael Savage and those who support his positions.

42.

Michael Savage's right to speech is protected by both the First Amendment. It is essence of freedom that voices can be raised strongly and without fear of illegal retaliation.  CAIR attempted to silence Michael Savage by stealing his work, misrepresenting it and then seeking to have advertisers drop his show.  This is a violation of Michael Savage's rights to speech and to his religious beliefs.

43.

The conduct of CAIR (in addition to raising money) in violating the copyright interests of Michael Savage was to gain media attention and control so that CAIR would be seen as the "moderate" voice in the media.  In fact CAIR is a radical voice that deliberately attempts to be seen as centrist so that media time goes to CAIR and once on the air, CAIR directs its rhetoric to the benefit of its extremist clients.  This is a deliberate tactic and the theft of the copyright material was part of a pattern and practice advancing this tactic.

**CAIR TARGETS THE 1st AMENDMENT**

44.

The copyright infringement and the use of the copyright material is a RICO predicate act and part of the broad conspiratorial purposes of CAIR.  Michael Savage is a long time opponent of CAIR and its interests.  For example, on February 21, 2006, CAIR National Legal Director Arsalan Iftikhar appeared on MSNBC's Scarborough Country debating the Dubai side of the U.S. ports story. Michael Savage was the leader of the public opposition to the purchase of major

U.S. ports by Dubai and Savage herein alleges that the misappropriation and misuse of his content as set forth herein was done in part in retaliation for Savage's opposition to overseas ownership of such a strategic asset.

45.

CAIR has consistently sought to silence opponents of violent terror, through economic blackmail, frivolous but costly lawsuits, threats of lawsuits and abuses of the legal system.  In doing so, CAIR has used extortion, threats, abused the court system, obtained money via interstate commerce under false and fraudulent circumstances.  These acts against speech and political action by Americans include those items set forth in the paragraphs immediately following.

46.

The copyright infringement against Michael Savage and the attempt to damage him economically is further part of an organized campaign to silence opposition figures by causing them severe economic damage.

**ABUSIVE LAWSUITS AND ECONOMIC BLACKMAIL BY CAIR**

47.

CAIR filed a frivolous lawsuit filed against American Citizens who alerted security when they observed six Muslim Imams boarding  US Airways Flight 300 in Minneapolis, Minnesota on November 20, 2006.  The Imams deliberately acted as if they were terrorists in order to create an incident.  The lawsuit by CAIR was intended, among other things, to intimidate American citizens so that they would be afraid to report terrorist activities when they observed them.  To protect Americans from such tactics, Congress passed legislation to protect reporting citizens.

48.

CAIR launched a public act of misinformation against Dr. Laura Schlessinger when she criticized the taking of school children to a Mosque to learn morals. Such a field trip likely violated the separation of church and state and Dr. Schlessinger's comments were protected by the First Amendment. Despite this, CAIR sought to sanction Dr. Schlessinger for her comments.

49.

In August 2005, CAIR pressured ABC radio to terminate radio talk show host Michael Graham for criticizing terrorism and Islam. The did this by making threats of economic harm against ABC.

50.

Threatened legal action against Young America's Foundation to stop them from allowing a speaker critical of CAIR address their group. There was no legal basis for CAIR's position, it was a threat of economic extortion as YAF would be forced to expend funds to defend the frivolous lawsuit.

51.

On March 31, 2004, CAIR sued Andrew Whitehead who operated the website anti-CAIR.org.net. This lawsuit alleged that Whitehead's articles showing CAIR's connection to Islamic terror were libelous. CAIR dropped the lawsuit when discovery requests were filed by Whitehead's attorney and the website continues to carry the same material.

52.

CAIR sued North Carolina congressman, Cass Ballenger who called CAIR "the fund-raising arm for Hezbollah" and raised the possibility that it would try to blow up the Capitol Building. CAIR responded with a $2 million defamation suit.

**FIRST AMENDED COMPLAINT**
**SAVAGE v. CAIR**                                  18

This lawsuit was dismissed by U.S. District Judge Richard Leon.  Apr. 11, 2006 update: A three-judge federal appeals court panel in Washington (made up of David Sentelle, Judith Rogers, and Thomas Griffith) ruled unanimously to uphold Judge Leon's March 2005 decision to dismiss CAIR's case.   Arsalan Iftikhar, CAIR's director of legal affairs, had described the purpose of the lawsuit as follows:

 "With this lawsuit, we are sending a clear message to all those who make malicious and defamatory statements against American Muslims or their institutions that they will be held accountable in a court of law.

53.

CAIR again targeted American students when the attacked Sara Townsley a columnist with the Cornell Daily Sun a Cornell University student newspaper, who wrote an article on Oct. 19, 2004 "A Vote for Kerry is a Vote for the Enemy," in which she stated that CAIR officials "have defended suicide bombers, funneled money to Hamas, and at least five of its leaders have been deported, indicted, or convicted on terrorism charges." CAIR responded that same day with an accusatory letter  ("Ms. Townsley uses regurgitated smears against CAIR from right-wing websites and noted Islamophobes such as Daniel Pipes and Steven Emerson") that also demanded the column's immediate removal, apologies for "these vicious attacks," and permission for CAIR to submit an oped. The CAIR letter also threatened that "If you elect to publish or distribute this confidential letter to any person or entity in any form; suit will be filed forthwith." Andy Guess, editor-in-chief of the Cornell Daily Sun, responded on Oct. 25 by denying any infraction and offering CAIR just a letter-to-the-editor for its response. On Oct. 26, CAIR responded that its "mentioning a possibly impending lawsuit is not

merely a hollow gesture on our part".

54.

The frivolous lawsuits, are direct attacks on the ability of ordinary Americans to criticize defendants and their co-conspirators because ordinary Americans are not financially capable of defending these lawsuits without suffering severe financial harm.  Such lawsuits are predatory, filed without a serious expectation of winning, but undertaken as a means to bankrupt, distract, intimidate, and demoralize defendants. Plaintiffs seek less to prevail in the courtroom than to wear down researchers and analysts. Even when the latter win cases, they pay heavily in time, money, and spirit. As counterterrorism specialist Steven Emerson comments, "Legal action has become a mainstay of radical Islamist organizations seeking to intimidate and silence their critics.

55.

The financial attacks on media personalities and student groups such as the Cornell University newspaper and Young America's Foundation are meant to intimidate Americans by using economic threats to violate the First Amendment rights of Americans.

56.

As set forth herein, CAIR is not a civil rights organization but is instead a political organization designed to advance a political agenda that is directly opposed to the existence of a free society that includes respect and dignity for all people and all religions.

57.

The copyright infringement herein is part of this plan.  CAIR's fundamental purpose is to be a lobbyist for foreign interests.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CAIR AND IT'S TERROR CONNECTIONS**

58.

The Foreign Agents Registration Act requires registration as an agent of a foreign principal when an organization acts on the order, request, or under the direction or control of a foreign principal, or whose activities are directed by a foreign principal when that person engages in political activities for or in the interests of such foreign principal or acts in a public relations capacity for a foreign principal.

59.

CAIR would have to register as a foreign agent if their activities were not hidden under the false claim that they are a civil rights organization that enjoys tax exempt status. The lawsuit against Michael Savage is part of the subterfuge of CAIR acting to protect civil rights when in fact is goal is to defend and promote foreign organizations and their illegal activities.

60.

The allegations in the Second Cause of Action contain more detail regarding CAIR's involvement in the 9/11 terror attacks and other terrorist activities. As set forth herein, plaintiff gives an overview of why CAIR's copyright infringement was intended not as "fair use" but to serve the political purposes of foreign radical groups.

61.

The funding and expenditures of the CAIR groups are deliberately confused by the use of different names, interlocking directorships and other devices

designed to obscure the foreign domination of this group.  Some of what is known is set forth herein.

62.

In 2005, CAIR's Washington branch received a donation of $ 1,366,466 from a Saudi Arabian named Adnan Bogary.   This was a major portion of the listed budget for that year.   This funding from overseas is obtained in many different ways some public and some hidden.  The details of which shall be established at trial.

63.

CAIR was tied to terror from the day it was formed.  The group was incorporated on or about 1994 by Omar Ahmad ("Ahmad") and Nihad Awad ("Awad").  Both men were officers of an terror organization known as the "Islamic Association for Palestine".

64.

Omar Ahmad was in fact, the President of the Islamic Association for Palestine.  This group was listed by the United States Attorney as an unindicted co-conspirator in the case of U.S. v. Holy Land Foundation, CR NO. 3:04-CR-240-G.  In addition, the U.S. Treasury Department's Office of Foreign Assets Control has designated this organization as supporting and/or engaging in terrorist activity.  Presently all financial transactions with this organization by residents of the United States, or within the borders of the United States, are prohibited. Federal agents locked down the Holy Land Foundation's headquarters in Richardson, Texas, as well as its three other offices in Bridgeview, Illinois, Patterson, New Jersey, and San Diego, California, securing their offices and taking custody of relevant business records. This action is taken under the authority of

Executive Order 13224, signed by the President on September 23, 2001, which authorizes aggressive actions against the bankers of international terrorism.

65.

The Washington based CAIR 990 return lists Omar Ahmad as their "Chairman Emeritus". Omar Ahmad is also listed on the CAIR website as being the founder of CAIR and being on the national board of directors. He is further listed as being from the San Francisco area, thereby connecting the Washington D.C. group to the California group through interlocking relationships.

66.

CAIR's parent group, IAP, was founded in or about 1982 by Musa Abu Marzook ("Marzook"). Marzook was IAP's ideological leader and controlling director from the date of its founding until shortly after his deportation from the United States in 1997. At all times relevant, Marzook was an operative of, and/or affiliated with, the "Harakat al-Muqawamah al-Islamiyyah," or "Hamas." Hamas is an international terrorist organization. Hamas is organized into distinct wings, or bureaus, that perform different functions, but operate as a seamless whole. It includes a military wing, responsible for carrying out suicide bombings and other terrorist attacks; a social wing, which operates much like a social welfare agency; and a political wing, which sits above the military and social wings and is responsible for setting policies and guidelines regarding Hamas' activities. The defendant Holy Land Foundation (HLF), sometimes called "the Fund," was an integral part of the Hamas social infrastructure. Not only did HLF operate to support the Hamas agenda, but it was created for that very purpose.

67.

On January 24, 1995, pursuant to Executive Order 12947, the Department

**FIRST AMENDED COMPLAINT**
**SAVAGE v. CAIR**                                        23

of Treasury, Office of Foreign Assets Control, designated Hamas as a Specially Designated Terrorist organization. This designation makes it illegal for any United States person or entity to engage in any unlicensed transactions or dealings involving the property or interests of Hamas. Hamas' designation as a Specially Designated Terrorist organization has remained in place since January 24, 1995. On October 8, 1997, the Secretary of State,pursuant to the laws of the United States, designated Hamas as a "Foreign Terrorist Organization." As a result of this designation, it became illegal for any person within the United States or subject to its jurisdiction to provide material support or resources to Hamas. In 1998, the director of the United States Federal Bureau of Investigation ("FBI") counter-terrorism unit stated IAP was "a Hamas front.(that is) controlled by Hamas, it brings Hamas leaders to the US, it does propaganda for Hamas."

68.

The government's actions regarding IAP is well earned by the group.  For example, during a youth session at IAP's third annual convention in Chicago in November 1999, IAP President and CAIR founder, Omar Ahmad delivered a speech praising suicide bombers. "Fighting for freedom," he said, "fighting for Islam -- that is not suicide. They [the suicide bombers] kill themselves for Islam." (cited in Jihad in America by Steven Emerson)

69.

Lisa Gardiner, a reporter at the Argus newspaper in Fremont, California reported that Ahmad stated at a public event that she attended that "Islam isn't in America, to be equal to any other faith, but to become dominant. The Koran, the Muslim book of scripture, should be the highest authority in America, and Islam the only accepted religion on Earth."  Ahmad now denies making this statement.

1
2                                      70.
3       CAIR opened its first office in Washington, DC, with the help of a $5,000
4    donation from the terror group, the Holy Land Foundation for Relief and
5    Development (HLF).  This group, ,like CAIR, is a self-described charity founded.
6
     It was founded by Hamas operative, Mousa Abu Marzook. In the government brief
7
8    in U.S. v. Holy Land Foundation, Case No. 3:04-CR-240-G, United States District
9    Court, Northern District of Texas, the United States alleges that "The leader of the
10   Palestinian Committee in the United States at that time was unindicted co-
11   conspirator Mousa Abu Marzook. Marzook is now – and has been since 1995 – a
12   Specially Designated Terrorist and Hamas leader."
13                                      71.
14        At a 1994 meeting at Barry University, CAIR co-founder Nihad Awad
15   stated that:
16
          "I am a supporter of the Hamas movement."
17
18        Awad wrote in the Muslim World Monitor that the 1994 trial which had
19   resulted in the conviction of four Islamic fundamentalist terrorists who had
20   perpetrated the previous year's World Trade Center bombing was "a travesty of
21   justice."
22                                      72.
23        Hamas is listed as a terrorist organization by Canada, the European Union,
24   Israel, Japan, and the United States.  Hamas is banned in the Muslim nation of
25   Jordan, Australia and the United Kingdom
26
27
28
     **FIRST AMENDED COMPLAINT**
     **SAVAGE v. CAIR**                          25

1

**CALIFORNIA CAIR GROUP'S EXTREMIST TIES**

2

73.

3

4

The website carrying the copyright infringing material is a Santa Clara

based CAIR group.  That group is sued herein under its actual name, which is the

5

"Council on American Islamic Relations of Santa Clara" This group filed its 2005

6

Form 900 return under the name, "Council on American Islamic Relations,

7

California."  Various California based CAIR groups operate under names such as

8

Council on American Islamic Relations, California.  It is impossible without

9

discovery to fully distinguish between them.   They also cross fund each other.

10

11

74.

12

The Santa Clara based group lists two donations made by the Santa Clara

13

group to Islamic Relief.  Islamic Relief is an organization listed by the United

14

States Attorney as an unindicted co-conspirator in the case of U.S. v. Holy Land

15

Foundation, CR NO. 3:04-CR-240-G.  This Santa Clara group also donated to

16

CAIR's Washington group.  In year 2000 the group identified itself as "Council on

17

American Islamic Relations N. Cal" and in that IRS form 990 it indicated that it

18

donated funds to the Holy Land Foundation which has been identified by the

19

United States Attorney and the President of the United States as supporting

20

Hamas.   This was done at the same time that CAIR founder and Hamas affiliated

21

22

Omar Ahmed, sat on the board of this chapter.

23

75.

24

CAIR's Los Angeles branch publishes a magazine called "In-Focus".  While

25

published in Los Angeles its board has included members of the national CAIR

26

board of directors.  Asthma Ahmad is the Managing Editor and Staff Writer for

27

CAIR-California's monthly tabloid, In Focus.

28

**FIRST AMENDED COMPLAINT**
**SAVAGE v. CAIR**                    26

76.

Under Ahmad's leadership, In Focus published an article lauding the terrorist group Hezbollah and its leader Hassan Nasrallah. The piece read, "[I]t was undoubtedly the epic heroism of the resistance fighters that dealt the humiliating defeat to the Anglo-American-backed Zionist forces, but such heroism would not have been possible without the larger-than-life leader to inspire, direct and focus it. Nasrallah's leadership in war and later has made him into an emblematic figure of long-cherished hope not only to a majority of the Lebanese people but also to the Arab nation as a whole and indeed to the Muslim world... The valour, selflessness and determination that made it possible for the resistance he led to push back the Zionist military giant cannot be denied..." (Mulham Assir, In Focus, 'Nasrallah – Leadership and Restraint,' October 2006)

77.

Under Ahmad's leadership, In Focus has published full page, color advertisements for the terrorist group falsely claiming to be a charity, Islamic Relief. (In Focus, June 2005 – Present) According to the Israeli government, Islamic Relief is a Hamas front that has provided funds and assistance to Hamas. (Chris McGreal, The Guardian, 'Israel accuses British-funded Islamic charity of being front for terrorists,' May 31, 2006). In April of 2005, In Focus published a full page ad for ICNA Relief, an Islamist "charity" that is the top donor to a Pakistani group that gave $99,000 to the head of Hamas, Khaled Mashaal, in August of 2006. (Joe Kaufman, FrontPage Magazine, 'Helping Hand to Hamas,' May 15, 2007)

78.

In March of 2006, In Focus published a full-page ad from the Citizen's

Committee for Equal Justice announcing an event to demand the release of terrorist Sami Al-Arian. (In Focus, March 2006).  Al-Arian, a former university professor, was arrested by the United States government in 2003 on charges that he funded and was the U.S. chief of operations of a terror group that was responsible for hundreds of terrorist acts in Israel, resulting in over 100 deaths. He was acquitted on eight of the 17 charges against him December 2005 after a six month trial but other charges remained unresolved by the jury.  On April 14, 2006 Al-Arian pleaded guilty to conspiracy to provide services to the Palestinian Islamic Jihad and he agreed to be a prison sentence followed by deportation.

79.

In the October 2005 issue of In Focus, Ahmad lauded senior advisor to the Muslim Public Affairs Council (MPAC), Maher Hathout, as a "prominent local speaker." (Asthma Ahmad, In Focus, 'The Night Journey Remembered,' October 2005) Hathout is a Hezbollah supporter that declared, in May of 2001, that the United States is "under Israeli occupation." (Zionist Organization of America, 'ZOA Shocked By Decision To Give LA Human Relations Award To Pro-Hizballah, U.S. & Israel-Basher Maher Hathout,' September 6, 2006).

80.

Featured on Ahmad's Discover Islam site were downloadable lectures given by Jamal Badawi and Ingrid Mattson. (Discover Islam, January 1, 2003 – October 21, 2004) Both Badawi and the organization Mattson is the President of, the Islamic Society of North America (ISNA), were named as co-conspirators in the trial against the Hamas charity, the Holy Land Foundation (HLF). (U.S. District Court for the Northern District of Texas – Dallas Division, United States of America vs. Holy Land Foundation.

1

2    81.

3    While Ahmad was Editor of the National MSA newsletter, MSA Link, an

4    article was published in it threatening violence. It read, "Some call it resistance.

5    Some call it terrorism. Others call it revolutionary violence and some describe it as

6    civil disobedience. We just call it 'Intifada'... They can suppress us, but we will

7    erupt again." (Idris Elbakri, MSA Link, Vol. 17, 'We are the Palestinian People,'

8    March 2002)

9    82.

10    In October of 2002, on behalf of CAIR-California, Ahmad advertised a fund

11    raising banquet featuring suspected co-conspirator of the 1993 World Trade

12    Center bombing, Siraj Wahhaj. The title of the event was 'A United and Secure

13    America: With Liberty and Justice for All.' (Asthma Ahmad, Dar ul Falah Forum,

14    'CAIR Annual Fundraiser,' October 6, 2002)

15    83.

16    The involvement of California based CAIR groups with terror ideology and

17    terror organizations can be further seen in the 2004 tax return of the Santa Clara

18    based CAIR group.  This return shows that it donated to the Texas based group

19    located in Dallas as well as "Café Intifada".  The group also stated that it invests

20    money with the North American Islamic Trust.  The United States Attorney  in the

21    case of U.S. v. Holy Land Foundation, CR NO. 3:04-CR-240-G has listed this

22    organization as an entity that is/was a member of the terrorist group, the U.S.

23    Muslim Brotherhood.

24

25    84.

26    The structure of these groups has an almost unfathomable complexity.

27    Faoud Khatib who is listed as the CEO of the Santa Clara based CAIR is also the

28

**FIRST AMENDED COMPLAINT**
**SAVAGE v. CAIR**                                   29

CEO of another CAIR related organization called CAIR California Title Holding Corporation.  This same person is listed on the CAIR website as being on the national CAIR board of directors.

**CAIR LEADERSHIP'S RELATIONS WITH TERRORISTS AND THEIR SUPPORT NETWORK**

85.

The involvement of CAIR's founders in illegal conduct was addressed on February 2, 1995, when U.S. Attorney Mary Jo White named CAIR Advisory Board member and New York Imam Siraj Wahhaj as one of the "unindicted persons who may be alleged as co-conspirators" in Islamic Group leader Omar Abdel Rahman's foiled plot to blow up numerous New York City monuments.

86.

 On May 7, 1996, CAIR coordinated a press conference to protest the decision of the U.S. government to extradite Marzook for his connection to terrorist acts performed by Hamas. CAIR characterized the extradition as "anti-Islamic" and "anti-American."

87.

Prior to 9/11, CAIR continued in its claim that it was a civil rights organization.  They made this claim when in October 1998, CAIR demanded the removal of a Los Angeles billboard describing Osama bin Laden as "the sworn enemy," asserting that this depiction "offensive to Muslims."

88.

Also in 1998, CAIR denied bin Laden's responsibility for the two al Qaeda bombings of American embassies in Africa. CAIR's leader Ibrahim Hooper, claimed the bombings resulted from "misunderstandings of both sides."

89.

In a July 1998 news article CAIR co-founder Omar Ahmad is quoted speaking to a group of California Muslims expressing his hope of seeing an America under the domination of Islam. In that article, Ahmad is quoted as saying,

Islam isn't in America to be equal to any other faith, but to become dominant. The Koran ... should be the highest authority in America, and Islam the only accepted religion on earth.

90.

On October 5, 2001, just weeks after 9/11, CAIR's New York office sent a letter to The New York Times arguing that the paper had misidentified three of the hijackers and suggesting that the attacks may have been committed by people who were impersonating Arab Muslims.

91.

CAIR further exploited 9/11 as it put on its website a picture of the World Trade Center in flames and below it a call for donations that was linked to the Holy Land Foundation website.

92.

The HLF is the Holy Land Foundation.   On December 4, 2001, the Attorney General of the United States stated that "the Holy Land Foundation, received much of its early money from Mousa Abu Marzuq, a top Hamas official who, the U.S. courts have determined, was directly involved in terrorism."

93.

The use CAIR's website to misappropriate the spirit of 9/11 charity to raise money for a terror organization is a pattern of conduct of CAIR that has been repeated with the appropriation of Michael Savage's material for CAIR's own

purpose.  While the outrage of diverting 9/11 charity is unmatched in its callousness, the success of that enterprise may well have emboldened CAIR in its present conduct.

94.

When the President of the United States closed the Holy Land Foundation in December 2001 for collecting money "to support the Hamas terror organization," CAIR decried his action as "unjust" and "disturbing."

95.

On April 20, 2002, CAIR's director spoke at a rally in Washington D.C.  He spoke from a podium next to a Hezbollah flag.

96.

On December 29, 2004 Wagdy Ghoneim, an extremist Egyptian cleric known for his advocacy in support of violence and hatred for Jews, decided to voluntarily leave the country after being accused of immigration violation, CAIR's director in California, Hussam Ayloush, told The Los Angeles Times that the case demonstrated "the selective application of laws on Muslims." CAIR has never publicly criticized the radical statements made by Ghoneim.

97.

In a July 7, 2004 interview with BBC, Gary Douglas Hooper, CAIR's spokesman, defended Sheik Yusuf Qaradawi, a Qatar-based Muslim cleric known for his support for terrorism, as "respectable," adding: "I don't think there's any incitement of violence on his part."  Qaradawi was an open supporter of Hamas, Islamic Jihad and Hezbollah, as well as groups targeting U.S. forces in Iraq. Qaradawi is barred from entering the U.S. because of his advocacy of violence.

98.

On April 13, 2005: Ghassan Elashi, a founding board member of CAIR's Texas chapter, and two of his brothers, were found guilty of supporting terrorism by funneling money to the leader of Hamas. They were convicted in a federal court in Texas of handling and trying to conceal an investment by senior Hamas leader Musa Abu Marzuq.

99.

In July 2004, Ghassan Elashi was convicted on separate charges of illegally exporting goods to Syria and of money laundering. At that time, a representative of CAIR's Dallas-Fort Worth chapter, Khalil Meek, argued that the only thing the Elashis were guilty of was the "crime of being Muslims in America. Elashi is also on the board of the Hamas supporting Holy Land Foundation.

**PHILADELPHIA MEETING OF HAMAS**

100.

In October 1993, less than one month after the public signing of the Oslo Peace Accords which attempted to end the violence between the Israeli's and Palestinians,  approximately 20 members of the shadowy group sometimes called the "Palestinian Committee" gathered together in Philadelphia, Pennsylvania to discuss how best to proceed in light of the Olso Accords.  Ghassan Elashi was one of the people present.

101.

Attendees at the Philadelphia meeting, were admonished not to mention "Hamas," but rather to refer to it as "Samah," which is Hamas spelled backwards. Attendees questioned how they could continue their quest to defeat the peace process without being viewed as "terrorists." They discussed their concern that the

peace process would attract Palestinian support and further complicate their ultimate goal of creating an Islamic state throughout Israel. They agreed that they must operate under an ostensible banner of apolitical humanitarian exercise in order to continue supporting Hamas' vital social recruitment effort.

**INTERNATIONAL FUNDING**

102.

CAIR receives significant international funding, for example, in 1999 the Islamic Development Bank gave a 250,000 US dollar grant to CAIR to purchase land for a national headquarters. In 2002, the World Association for Muslim Youth (WAMY), a Saudi government-funded organization, financed distributing books on Islam free of charge 2002 and an advertising campaign in American publications. This included a quarter page in USA Today each Friday, for a year, estimated to cost $1.04 million. In 2003, Saudi Prince Alwaleed bin Talal donated $500,000 to distribute the Koran and other books about Islam in the United States.In 2005, CAIR's Washington branch received a donation of $ 1,366,466 from a Saudi Arabian named Adnan Bogary.  In 2006, Sheikh Hamdan bin Rashid Al Maktoum, Deputy Ruler of Dubai and UAE Minister of Finance and Industry, financed the building of a property in the US to serve as an endowment for the organization. This gift is thought to generate income of approximately 3 million US dollars a year.

**MORE TIES TO TERRORISM**

103.

On June 6, 2006, the Ohio affiliate of the Council on American-Islamic Relations (CAIR-OH) honored one of the unindicted conspirators in that 1993 World Trade Center bombing, **Siraj Wahhaj**.    Wahhaj had also served as a

defense witness at the trial of one of the men convicted for that terrorist attack, the

"Blind Sheikh" Omar Abdel-Rahman (a conviction that CAIR has labeled "a

travesty of justice"). More than 400 CAIR-OH supporters gathered at this fund-

raising banquet.

104.

On August 7, 2006: Altaf Ali, executive director of CAIR-Florida,

published an opinion piece in the Sun-Sentinel, in which he compared Israel and

the U.S. government to Al Qaeda.

105.

On August 12, 2006: CAIR participated in and endorsed several rallies in

support of Hezbollah and the "resistance" fighting American forces in Iraq.

106.

In May 2007 CAIR was identified by the government as an unindicted

co-conspirator in a case involving a charity that was allegedly affiliated with

Hamas. Federal prosecutors in the case of the Holy Land Foundation listed CAIR

under the category: "Individuals/entities who are and/or were members of the US

Muslim Brotherhood's Palestine Committee and/or its organizations." The

government also listed Omar Ahmad, CAIR's founder and chairman emeritus,

under the same category.

107.

In August 2-7, 2007 during the Holy Land Foundation trial in Texas, FBI

agent Lara Burns testified about evidence connecting CAIR and two of its

founders to the Holy Land Foundation as well as to the fundamentalist Muslim

Brotherhood movement that established Hamas in Gaza and the West Bank. The

agent identified CAIR executive director Nihad Awad as one of the scheduled participants at a meeting of Hamas officials in a hotel in Philadelphia in 1993. At the time, Awad was a representative of IAP. Burns also identified CAIR co-founders Awad and Omar Ahmed as members of the Palestine Committee set up by the Muslim Brotherhood.

108.

Attacks on other public figures have included an attack on Presidential candidate, Rudy Guiliani for using the phrase "Islamic Terrorism" and for accepting the endorsement of Pat Robertson whose endorsement of Guiliani included a reference to the "bloodlust of Islamic terrorists".

109.

CAIR also attacked Guiliani's choice of Daniel Pipes as foreign policy advisor. Pipes is the person who republished the Fremont Argus quotation from CAIR's cofounder that:

> Islam isn't in America to be equal to any other faith, but to become dominant. The Koran ... should be the highest authority in America, and Islam the only accepted religion on earth.

110.

Based upon these facts and further facts to be produced at trial, plaintiff alleges that CAIR is not a civil rights organization but instead is a political vehicle of international terrorism and that the copyright infringement itself and the manner in which the material was used, was part of a deliberate practice and pattern to do material harm to those voices who speak against the violent agenda of CAIR's clients.

**JURY TRIAL DEMAND**

111.

Plaintiff hereby demands a jury trial in this matter as to each and every cause of action.

**DAMAGES AS TO THE FIRST & SECOND CAUSES OF ACTION**

112.

Michael Savage seeks actual, general and special damages according to proof as to each cause of action.   Damages for the First Cause of Action for Copyright Infringement include but are not limited to actual Damages and Profits as described in 17 USC 504.   Damages as to the Second Cause of Action include statutory damages, trebling of damages.  As to each cause of action, plaintiff seeks costs and attorney's fees.

113.

Michael Savage does not presently elect but reserves (for the First Cause of Action), the right to elect statutory damages as set forth in 17 USC 504.

114.

Michael Savage further contends that the actions of defendants and each of them were wanton, wilful and malicious.  Michael Savage contends that the actions of defendants were criminal.  For these reasons and for the reasons set forth herein, Michael Savage is entitled to punitive and exemplary damages as to each cause of action.

115.

Michael Savage reserves the right to seek injunctive relief and other

remedies permitted by law.

# SECOND CAUSE OF ACTION

Racketeer Influenced and Corrupt Organizations (RICO) Act

(18 USC §§'s 1961-1968.)

116.

Michael Savage realleges and incorporates herein, paragraphs 1-85 of the complaint.

**JURISDICTION AND VENUE**

117.

In addition to the jurisdiction and venue previously alleged herein. Jurisdiction arises under this cause of action pursuant to 28 U.S.C. §§1330(a), 1331 and 1332(a)(2)  and 18 U.S.C. §2388. Jurisdiction also arises based on the Named Defendants' violations within the meaning of 28 U.S.C. §§1605(a)(2), (a)(5) and (a)(7) (the Foreign Sovereign Immunities Act), 28 U.S.C. §1350 ("Alien Tort Act"), the Torture Victim Protection Act, PL 102-256, 106 Stat. 73 (reprinted at 28 U.S.C.A. §1350 note (West 1993)), and 18 U.S.C. §2333. Plaintiffs allege that both personal and federal question jurisdiction exists and arise pursuant to these laws and statutes.

**RICO CONSPIRACY DESCRIBED**

118.

CAIR and its co-conspirators have aided, abetted, and materially sponsored and al Qaeda and international terrorism. CAIR is an outgrowth of the Hamas front group the Islamic Association of Palestine. The FBI's former associate

director in charge of Investigative and Counter-Intelligence Operations described the Islamic Association of Palestine as an organization that has directly supported Hamas military goals and is a front organization for Hamas that engages in propaganda for Islamic militants. It has produced videotapes that are very hate filled, full of vehement propaganda. It is an organization that has supported direct confrontation.

119.

CAIR and its coconspirators have, since their inception, been part of the criminal conspiracy of radical Islamic terrorism. These organizations play a unique role in the terrorist network. They emanate from the notorious HAMAS terrorist organization and like so many of the terrorism facilitating charities named and indicted by the United States government they are engaged in fund raising under the guise of assisting humanitarian causes they are, in reality, a key player in international terrorism.

120.

The unique role played by CAIR and CAIR-Canada is to manipulate the legal systems of the United States and Canada in a manner that allows them to silence critics, analysts, commentators, media  organizations, and government officials by leveling false charges of discrimination, libel, slander and defamation. In addition, both organizations have actively sought to hamper governmental anti-terrorism efforts by direct propaganda activities aimed at police, first responders, and intelligence agencies through so-called sensitivity training. Their goal is to create as much self-doubt, hesitation, fear of name-calling, and litigation within police departments and intelligence agencies as possible so as to render such authorities ineffective in pursuing international and domestic terrorist entities.

121.

The role of CAIR and CAIR-Canada is to wage PSYOPS (psychological warfare) and disinformation activities on behalf of Whabbi-based Islamic terrorists throughout North America. They are the intellectual "shock troops" of Islamic terrorism.

122.

In the years and months leading up to the terrorist attacks on September 11, 2001 these organizations provided a variety of services to terror groups in order to interfere with law enforcement and intelligence officials in the performance of their duties. They did this not to ensure civil rights as Americans understand the term but "civil rights" in their interpretation which was and is the domination of their group over the United States.

123.

In Estate of John P. O'Neill, Sr., et al. v. Al Baraka, et al. 04 CV 01923 (RCC) filed in United States District Court, Southern District of New York the estate of head of security for the World Trade Center is suing CAIR among others for being part of the RICO conspiracy leading to the terrorist attack of 9/11. The allegations therein are contained in this pleading and as the outcome of that case may influence the case at bar, this relationship is disclosed herein.

124.

As set forth more fully herein, the RICO predicate acts of this conspiracy include but are not limited to the following:

**Conspiracy to commit murder** (in the United States, in the 9/11 Terrorist attacks and against United States Citizens among others)

**Conspiracy to commit arson** (in the United States and in the 9/11 Terrorist

1  attacks)

2  **Fraud with Identification Documents** 18 U.S.C. § 1028

3  **Mail Fraud** 18 U.S.C. § 1341

4  **Wire Fraud** 18 U.S.C. § 1343

5  **Financial Institution Fraud** 18 U.S.C. §1344

6
   **Illegal transactions in monetary instruments** 18 U.S.C. § 1956
7
   **Money laundering** 18 U.S.C. § 1957
8
9  **Defrauding the United States Government** 18 U.S.C. § 371

10 **Travel Act** 18 U.S.C. § 1952

11 **Filing false or materially false tax returns**

12 26 U.S.C. § 7206(1),(2)

13 **Engaging in a corrupt endeavor to impede and impair the due administration**

14 **of the internal revenue laws** 26 U.S.C. § 7212(a)

15 **Providing material support of Terrorism** 18 U.S.C. § 2332(b)(g)(5)(B); 18

16 U.S.C. § 2339A; 18 U.S.C. § 2339B; 18 U.S.C. § 2339C

17 **Criminal Infringement of Copyright**

18
   18 U.S.C. 2319
19
        In addition, plaintiff realleges those factual assertions set forth in the First
20
21 Cause of Action.

22                                    125.

23      The conduct engaged in by CAIR that constitutes the RICO predicates

24 includes but is not limited to:

25 **Mid-1990s to 9/11/2001**

26      CAIR conducted or participated, directly or indirectly, in the conduct of the

27 Rico Enterprise's affairs and participated in the operation or management of the

28

operation of the Rico Enterprise itself.  CAIR conspired to conduct or participate, directly or indirectly, in the conduct of the Rico Enterprise's affairs and conspired to participate in the operation or management of the operation of the Rico Enterprise itself.   Throughout this period, CAIR conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the 9/11 Attack.

**Late 1990s to 9/11/2001**

CAIR conducted or participated, directly or indirectly, in the conduct of the Rico Enterprise's affairs and participated in the operation or management of the operation of the Rico Enterprise itself.  CAIR conspired to conduct or participate, directly or indirectly, in the conduct of the Rico Enterprise's affairs and conspired to participate in the operation or management of the operation of the Rico Enterprise itself.  CAIR undertook the above named actions as part of a conspiracy to commit murder and arson, in that they knew that the Rico Enterprise in which it was participating, Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support supplied by CAIR.

**Mid-1990s to 9/11/2001**

CAIR conducted or participated, directly or indirectly, in the conduct of the Rico Enterprise's affairs and participated in the operation or management of the operation of the Rico Enterprise itself.  CAIR conspired to conduct or participate, directly or indirectly, in the conduct of the Rico Enterprise's affairs and conspired

to participate in the operation or management of the operation of the Rico Enterprise itself. CAIR agreed to form and associate with the Rico Enterprise and agreed to commit more than two predicate acts, i.e., multiple acts of murder and arson, in furtherance of a pattern of racketeering activity in connection with the Rico Enterprise.

Plaintiff further realleges those matters set forth in the First Cause of Action.

126.

The predicate acts form a pattern of racketeering in that they are repeated, ongoing, continuous, and are a part of the Rico Enterprise's regular way of doing business. Other of the defendants consistently, evenly constantly, laundered money, filed false tax returns, and otherwise impeded and impaired the administration of the tax laws as part of their scheme to conduit money to terrorists, and yet obfuscate their support of Radical Muslim Terrorism and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders.

127.

The predicate act relates to each other (horizontal relatedness) as part of a common plan because each act of knowing and intentionally providing financial services and money laundering and tax evasion allowed certain of the defendants, specifically including CAIR, to surreptitiously provide funds to terrorist organizations, including al Qaida, Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the 9/11 Attacks and continued thereafter.

128.

This criminal enterprise has its origins in the defeat of the Soviets in Afghanistan in the late 1980s, when Osama Bin Ladin ("Bin Ladin") formed an organization called "The Foundation" or "al Qaida." Al Qaida was intended to serve as a foundation upon which to build a global Islamic army. In February, 1998, a declaration was issued, following the holding of a terrorist summit, announcing the formation of the International Islamic Front for the Jihad Against Jews and Crusaders, the precursor of which was the Muslim Brotherhood and the Islamic Jihad. The structure of the Rico Enterprise is an association in fact with common and complex goals that consist of far more than the mere desire to perpetrate the acts of racketeering outlined herein. Rather, the Rico Enterprise utilizes acts of racketeering to further its overall common purposes of: (I) spreading a particularly virulent brand of radical, conservative Islam; (ii) eliminating Western influences in Islamic countries, including Western influences that are perceived to keep in power repressive Saudi-American regimes that are not true to Islam; and (iii) punishing Israel, and the United States for its perceived support of Israel. Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, does not feature a centralized hierarchy, because the lack of a centralized hierarchy is essential to the Rico Enterprise's clandestine nature and its success. Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets, financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. CAIR fit neatly into this

framework by raising funds for and providing funding to an otherwise providing material support for the members of the Rico Enterprise who engaged in the 9/11 Attack.

### 129.

The Rico Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations.  These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons).  These transactions are accomplished through, inter alia, the use of wire transfers and electronic transmissions.

### 130.

On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars.  The Rico Enterprise relies upon a global network of banks and financial institutions, including CAIR, and illegal activity to generate material support to continue its terrorist operations.

### 131.

The pattern of racketeering activity conducted by CAIR is separate from the existence of Radical Muslim Terrorism, and/or the Al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, but was a necessary component to the 9/11 Attack.  The RICO enterprise conducts terrorism all over the world; the racketeering activity conducted by CAIR funds that activity, which activity culminated in the 9/11 Attack.  The usual and daily

activities of the Rico Enterprise include recruitment, indoctrination,  and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein.

132.

The Rico Enterprise benefits by spreading its ideology, by suppressing other forms of Islam, and through the gratification of destroying its perceived enemies. 10. The Rico Enterprise, and the racketeering activities conducted by CAIR, relies heavily on the American interstate system of commerce for banking, supplies, communications, and virtually all its essential commercial functions, and in that manner affects interstate commerce.

133.

The enterprise and the racketeering activities conducted, engaged in, and/or transacted business within and in the United States and elsewhere, and utilized, possessed, used, transferred, owned, leased, operated,  and/or controlled assets in the United States and elsewhere.   Furthermore, activities and actions of the Rico Enterprise affect interstate commerce as demonstrated by the 9/11 Attack itself, which caused damage to the United States economy and property and businesses situate therein.  See Rasul v. Bush, 124 S. Ct. 2686, No. 03-334, 2004 U.S. LEXIS 4760, *8 (stating that the 9/11 Attack "severely damaged the United States economy").

134.

The history of the conspiracy behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered.  After being turned out of the Sudan in May

1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including CAIR, who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors.

135.

They also relied heavily on certain imams at mosques who were willing to divert the Zakat, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities.

136.

The money raised from these various sources, including CAIR, were used by the Rico Enterprise to accomplish its goals, with the knowledge and awareness of CAIR, of both those goals and the uses to which the Funds were put. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States.

137.

The Funds enabled the Rico Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Rico Enterprise.  The Funds also provided communications sufficient system that gathered information on and formed assessments of the Rico Enterprise's enemies' strengths and weaknesses.

138.

The Funds enabled the Rico Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives.

139.

The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination. All trainees and other personnel were encouraged to think creatively about ways to commit mass murder. The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan. From the ranks of these recruits the nineteen perpetrators of the 9/11 Attack were selected. None of this would have been possible without the funds supplied by participants and conspirators like CAIR.

140.

The RICO Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including CAIR. In order to identify nineteen individuals willing, able and competent to carry out the 9/11 Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by CAIR. CAIR, with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly.

141.

CAIR conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs and participated in the operation or management of the

operation of the RICO Enterprise itself.  CAIR conspired to conduct or participate, directly or indirectly, in the conduct of the RICO Enterprise's affairs and conspired to participate in the operation or management of the operation of the RICO Enterprise itself. CAIR also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations.

142.

Specific ties to terror groups and terror funding by CAIR include those matters set forth in the First Cause of Action but pled with more specificity in this RICO action they include the matters that following herein.

143.

The Council for American–Islamic Relations is a Muslim Brotherhood front organization.  It works in the United States as a lobby against radio, television and print media journalists who dare to produce anything about Islam that is at variance with their fundamental agenda.

144.

CAIR has links to both Hamas and the Muslim Brotherhood.  Terrorism expert, Steve Emerson has stated before Congress that CAIR is a front for Hamas. CAIR was founded in 1994 as an offshoot of the Islamic Association for Palestine ("IAP").  It was founded by two former leaders of the IAP, Hamas supporters, Omar Ihmad and Nihad Amad.

145.

Additionally, a founding director AP is a front for the Palestinian terrorist organization, Hamas.

146.

In 2002, Judge Gladys Kessler wrote that, "[t]here is evidence that at least one of these organizations, Islamic Association for Palestine ("IAP") has acted in support of the HAMAS."  Holy Land Foundation for Relief & Development v. Ashcroft, 219 F.Supp.2d 57, 70 (D.C. Dist. 2002).

147.

Also, founder Omar Ihmad was previously a key leader of the Palestinian Muslim Brotherhood.  CAIR was founded by donations from the Holy Land Foundation ("HLF"), which is a Specially Designated Global Terrorist Organization, World Assembly of Muslim Youth ("WAMY"), and International Islamic Relief Organization ("IIRO").

## ADDITIONAL INDIVIDUALS / ENTITIES INVOLVED WITH CAIR, CRIME & TERROR

148.

CAIR is funded in part, by terrorists.  The International Institute of Islamic Thought, an organization linked to the Muslim Brotherhood, donated money in 2003, according to its tax filings.

149.

Additionally, the **Saudi-based Islamic Development Bank** ("IDB") gave CAIR $250,000 in August 1999.  The IDB also manages funds for the Al-Quds which finance suicide bombings against Israeli civilians by providing funds to the families of Palestinian "martyrs."  CAIR has proven links to Islamic Terrorists.

150.

**Ghassin Elashi  Elashi** was the founder of CAIR's Texas chapter.  He was

convicted in July 2004 of shipping computers to Libya and Syria, two designated
state sponsors of terrorism.  In April 2005, he was also convicted of knowingly
doing business with Mousa Abu Marzook, a senior Hamas leader and Specially
Designated Terrorist.

151.

On July 27, 2004, he was indicted for providing material support to Hamas,
engaging in prohibited financial transactions with a Specially Designated Global
Terrorist, money laundering, conspiracy and filing false tax returns.

152.

In 1997, **Randall (Ismail) Royer**  began working as CAIR's
"Communications Specialist" and continues to work there through October 2001.
He also served as "Civil Rights Coordinator."  He was indicted on charges of
conspiring to help Al Qaida and the Taliban to battle American troops in
Afghanistan. On January 16, 2004, he plead guilty to lesser offenses and was
convicted of weapons and explosives charges in connection to a terrorist related
offense.

152.

As late as November 1, 2002, **Bassam Khafasi** served as CAIR's Director
of Community Relations.  In January 2003, he was arrested and indicted in
January 2003 on bank fraud charges.6  In September 2003, Kahfagi pleaded guilty
to visa fraud and bank fraud, for passing bad checks for substantial amounts in
early 2001, and he was deported.

153.

Khafagi also served as founding member and President of the Islamic
Assembly of North America ("IANA").  IANA is under investigation un the U.S.

for money laundering and recruiting terrorists over the Internet.  The FBI raided their offices in February 2003.

154.

**Rabih Hadid aka Haddad** served as a CAIR fundraiser.  Haddad was co-founder of the Global Relief Foundation ("GRF").  GRF was designated by the US Treasury Department for financing the Al Qaida and other terrorist organizations and its assets were frozen by the US Government on December 14, 2001.10   On this same date, Haddad was taken into custody based upon terrorism related charges.  According to the Treasury Department, Haddad was a member of Makhtab Al-Khidamat, the precursor to Al Qaida.

154.

In July 2003, Haddad was deported to Lebanon.12   Mohammad Nimer Nimer was the director of CAIR's Research Center.  He also served as a member of the Board of Directors of the United Association for Studies and Research ("UASR").  The UASR is the strategic arm of Hamas in the United States.

155.

**Imam Siraji Wahaj** is a member of CAIR's Board of Advisors.  Named in 1995 by U.S. Attorney Mary Jo White as a possible unindicted co-conspirator in the World Trade Center bombing case.  He serves as the spiritual leader of the al-Taqwa Mosque in Brooklyn, and provided a forum for Sheik Omar Abdel Rahman, who was convicted as the master-mind of the conspiracy. He is also the Vice President of the Islamic Society of North America, a group which embraces the elements of the Muslim Brotherhood.   Holy Land Foundation and Global Relief Foundation  Both HLF and GRF were listed on the US Treasury Specially Designated Global Terrorist list and their assets were frozen.  Prior to this

1   designation, CAIR actually solicited money for these organizations.

2   **CAIR & ITS 9/11 FUNDS APPEAL**

3                           156.

4       Immediately after the attacks on September 11, 2001, on the home page of

5   the CAIR website, it featured a section telling readers "what you can do for the

6   victims of the WTC and Pentagon attacks."  CAIR advised:  "Donate through

7   Global Relief Foundation" and "Donate through the Holy Land Foundation,"

8   providing the links to the groups' websites.  Additionally, in December 2001, the

9   FBI raided several offices of the HLF, under the order of the President of the

10  United States, as suspects of the main North American fundraiser for Palestinian

11  Islamic terrorist organization Hamas.  CAIR issued a public statement, along with

12  the Islamic Association for Palestine ("IAP") and the Muslim Student Association

13  ("MSA"), denouncing the President's order and insisting that these actions were

14  taken without any evidence.

15  **CAIR SUPPORTING VIOLENT EXTREMISTS**

16                          157.

17      CAIR has consistently opposed the US Government action against

18  individuals suspected of involvement in terrorism:  Sami Al-Arian  CAIR

19  vehemently defended the alleged Palestinian Islamic Jihad mastermind Sami

20  Al-Arian and alleged that his arrest was based on "political considerations."

21                          158.

22      On February 20, 2003,a South Florida professor **Sami al-Arian** was

23  indicted for allegedly serving as North American leader of Palestinian Islamic

24  Jihad ("PIJ"), a government-designated terrorist organization that was labeled by

25  Attorney General John Ashcroft as "one of the most violent organizations in the

**FIRST AMENDED COMPLAINT**
**SAVAGE v. CAIR**                    53

world," and which is allegedly responsible for the deaths of two Americans and over 100 Israelis.  Despite Al-Arian's documented history of extremism, CAIR officials have consistently defended him since his arrest.

159.

**Fawaz Damra  Damra** was convicted for concealing his involvement in groups that advocated "violent terrorist attacks against Jews and others" on his citizenship application.  CAIR-Ohio's Executive Director defended Damra as a "great interfaith leader."  CAIR Spokesman Ibrahim Hooper stated, "we're concerned that all of his due process is maintained and evidence be free of religious or ethnic stereotyping… We're always concerned when prominent leaders of the American Islamic community are charged, or detained, or harassed."

160.

With respect to **Musa Abu Marzook**, CAIR has defended this Hamas operative.  On August 7, 1995, the Deputy US Attorney for the SDNY requested the arrest and extradition to Israel of IAP founder Marzook (who was formerly the chief and is currently deputy chief of the Hamas Political Bureau.)  Marzook was arrested at Kennedy airport.  CAIR came out in support of Marzook by stating, "[t]he arrest, detention and extradition is politically motivated…[and] this campaign has been orchestrated to serve as a wedge between America and Islamic countries."

161.

In June 1996, CAIR signed an open letter to then Secretary of State Warren Christopher that railed against "the injustice that has prevailed against Dr. Marzook" and alleged that "our judicial system has been kidnaped by Israeli interests." The letter additionally stated, "Dr. Abu Marzook is a political leader; no

more, no less than any other political leader in the world.15  CAIR also labeled Marzook's incarceration a hate crime in a 1996 report.16  Jamil Al-Amim  CAIR responded to the arrest and conviction of Jamil Al-Amim by praising him, by raising funds for him and then denying his guilt after his conviction for the murder of an Atlanta policeman.

162.

**Ghoneim** is a radical Egyptian cleric who has been videotaped calling for suicide bombings at radical Islamic conferences.  He has been denied entrance to Canada after immigration officials determined he was a member of Hamas and the Muslim Brotherhood.17 In May 1998, he led an audience in a song with lyrics, "No to the Jews, descendants of the apes," at the CAIR co-sponsored rally at Brooklyn college.  After Ghoneim was arrested, CAIR's Southern California Executive Director Hussam Ayloush defended him: "[t]he whole Muslim community today is under a microscope of scrutiny. Committing a mistake that would invite a slap on the wrist for anyone else could lead to prison or deportation fro a Muslim."

163.

**Sheik Yusuf Al Qaradawi**  is a leader of the Muslim Brotherhood, who has issued fatwas calling for attacks on American forces and killing Jews and mandating Jihad.  In 2000, Qaradawi was banned from visiting the United States. However, CAIR has repeatedly championed Qaradawi, for example, CAIR's legal director Arsalan Iftikhar said: "if you look at Sheikh Yusuf Al-Qaradawi, the ---one of the most famous Muslim scholars in Cairo, Egypt, he has said unequivocally that people who commit suicide bombings and --- and acts of terror are completely outside the bounds of Islam."

164.

The following are fatwas and pronouncements of Qaradawi:  - Only July 13, 2004, on his weekly program on the Arab satellite channel Al-Jazeera Qaradawi accused "the Jews" of permitting the spilling o f Arab blood and of being oppressors, and he concluded by stating, "There is no dialogue between us except by the sword and the rifle…"20igned a statement calling for the support of the terrorist "resistance" in Iraq to the American and Coalition forces.21 - In March 2002, Qaradawi issued a fatwa on the "liberation" of "Muslim lands" from "disbelievers."22   As the foregoing demonstrates, CAIR thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.

165.

The support of extremists includes the filing of the frivolous by threatening lawsuit against United States citizens for reporting the deliberately threatening actions of the six Muslim Imams boarding  US Airways Flight 300 in Minneapolis, Minnesota on November 20, 2006.  This lawsuit was intended to intimidate Americans and prevent them from reporting terrorist activities. The vast amounts of overseas money (See paragraph 102 of this complaint) allows CAIR to file these lawsuits with impunity while the ordinary citizens are forced to seek pro bono counsel or face economic devastation. This is yet another example of CAIR's abuse of the privileges of a free society to further a terrorist agenda.

166.

The September 11th Attack and other terror activities are a direct, intended

and foreseeable product of CAIR's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders and other groups.  The US Airways Flight 300 lawsuit against citizens reporting suspicious activity demonstrates that CAIR has not retreated from its goals even following the 9/11 terror attack.

167.

The attacks against public figures opposing violent activities of the CAIR supported groups is part of this RICO conspiracy as set forth more fully in the First Cause of Action.

168.

The self ordained title of "civil rights organization" and minor efforts to mimic real civil rights organizations does not obscure the true purpose and long term conduct of CAIR, its affiliated groups, its members and the members of the conspiracy.

169.

Michael Savage is a target of this conspiracy. He is one target among many Americans so targeted including Dr. Laura Schlessinger, radio talk show host Michael Graham of WMAL-AM radio in Washington, D.C., Young America's Foundation, Andrew Whitehead of Anti-Cair, North Carolina congressman, Cass Ballenger,  Sara Townsley a columnist with the Cornell Daily Sun, the brave Americans who identified terrorist type activity on U.S. Airways flight 300, Terrorism expert Steven Emerson, Daniel Pipes, Rudy Guiliani, Robert Spencer, Representative Tom Tancredo and many others.

1    WHEREFORE, plaintiff seeks judgment as follows:

2    1. General damages according to proof;

3    2. Actual damages according to proof;

4    3. Special damages according to proof;

5    4. Attorney's Fees and costs;

6    5. All other damages allowed by statute;

7    6. Treble damages as to the Second Cause of Action.

8    7. Punitive and exemplary damages according to proof;

9    8. Such other and further relief including but not limited to injunctive relief

10   as allowed by law.

11

12

13   Dated: December 23, 2007

14

15                                    _____

16                                              Daniel Horowitz
                                       Attorney for Michael Savage

17

18

19

20

21

22

23

24

25

26

27

28