United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MICHAEL SAVAGE,

                  Plaintiff,

     v.

COUNCIL ON AMERICAN-ISLAMIC
RELATIONS, INC., COUNCIL ON
AMERICAN-ISLAMIC RELATIONS ACTION
NETWORK, INC., COUNCIL ON
AMERICAN-ISLAMIC RELATIONS OF
SANTA CLARA, INC., and DOES 3-100,

                  Defendants.
                                        /

No. C 07-6076 SI

**ORDER GRANTING DEFENDANTS'
MOTION FOR JUDGMENT ON THE
PLEADINGS**

Defendants' Rule 12(c) motion for judgment on the pleadings came on for oral argument on

April 7, 2008. Having considered the arguments of the parties and papers submitted, the Court hereby

GRANTS defendants' motion on both causes of action.

**BACKGROUND**

Plaintiff Michael Weiner, using the name "Michael Savage," is the host and star of "The Savage

Nation," a nationally-syndicated radio program that plaintiff alleges "reaches eight million listeners per

week." Second Amended Complaint ("SAC") at ¶¶ 1, 2. Plaintiff filed the instant suit in response to

the use by defendants the Council[1] on American-Islamic Relations, Inc., the Council on American-

Islamic Relations Action Network, Inc., and the Council on American-Islamic Relations of Santa Clara,

Inc. (collectively "CAIR"), of a four-minute audio clip taken from plaintiff's radio program. Plaintiff

_____

[1]This defendant was referred to as the "Counsel on American-Islamic Relations, Inc." in the
caption of the complaints. The parties apparently agree that the correct defendant is the "Council on
American-Islamic Relations, Inc." and the Court adopts this language.

**United States District Court**
For the Northern District of California

alleges that defendants, in posting the audio clip on their website, engaged in copyright infringement in an effort to raise money for terrorism and further a terrorist conspiracy. Plaintiff alleges that defendants are connected to terrorist organizations operating abroad and that defendants are responsible in some way for the September 11, 2001 terrorist attacks on the United States.

The 9/11 attacks were a staggering national tragedy. But it is important to note that this case is not about 9/11 or efforts by the United States to prevent future terrorist activities. It is, rather, a dispute about the ideas expressed in a four-minute audio clip and the protections of the First Amendment, protections upon which plaintiff relies for his livelihood and the airing of his radio program.

The audio clip at issue in this dispute was taken from the two-hour long Savage Nation program that aired on October 29, 2007, in which it is undisputed that plaintiff said the following, among other things, about Muslims and about CAIR:

(1) "I don't want to hear one more word about Islam. Take your religion and shove it up your behind."
(2) "They need deportation . . . .You can take [CAIR] and throw them out of my country."
(3) "You can take your due process and shove it . . . ."
(4) "[I]ts Muslims screaming for the blood of Christians or Jews or anyone they hate."
(5) "[Islam], a religion that teaches convert or kill, a religion that says oppress women, kill homosexuals . . . ."
(6) "The Quran is a document of slavery and chattel."

Ahmed Decl. at ex. A. In response to plaintiff's remarks, defendants posted on their website, www.cair.com, a detailed criticism of plaintiff's anti-Muslim and anti-CAIR commentary, entitled "National Radio Host Goes On Anti-Muslim Tirade." The web page explained defendants' objections to plaintiff's remarks, *see id.*, and included an audio file containing the above-quoted excerpts from the show that, when played in its entirety, runs for four minutes and thirteen seconds, SAC at ¶ 24. Plaintiff alleges that defendants' unauthorized use of his remarks was taken out of context and that defendants' "misportrayals" destroyed the value of his material and led to a loss of advertising revenue. SAC at ¶¶ at 34-35; *see also* Ahmed Decl. at exs. A & B.

Plaintiff filed his original complaint on December 3, 2007. He has amended it twice since then, once as of right on December 25, 2007, and a second time by stipulation of the parties on February 14, 2008. The Second Amended Complaint alleges copyright infringement and civil RICO claims against defendants. In a lengthy and polemical complaint, plaintiff alleges that CAIR misappropriated in excess

of four minutes of plaintiff's show for fund-raising purposes and that the segment was used in a manner designed to cause harm to the value of the copyrighted material. He alleges that this misappropriation was part of a criminal and political agenda to silence those speaking out against various facets of Islam. Plaintiff alleges that defendants' furtherance of foreign terrorist interests is part of a larger conspiracy of criminal activity that gives rise to his civil RICO claims. Generally, he alleges that defendants work to raise funds for terrorist groups, aim to silence voices that oppose their views, and have board members who are tied to alleged terrorist organizations. He further alleges that defendants are the domestic branch of a foreign terror organization posing as a civil rights organization.

Further reference to relevant background facts and allegations is set forth below in the body of the discussion.

**LEGAL STANDARD**

"After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989). "For purposes of the motion, the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false." *Id.*

Although Rule 12(c) neither specifically authorizes nor prohibits motions for judgment on the pleadings "directed to less than the entire complaint or answer . . . [i]t is the practice of many judges to permit 'partial' judgment on the pleadings (e.g. on the first claim for relief, or the third affirmative defense)." *See* William W. Schwarzer, A. Wallace Tashima & James M. Wagstaffe, *Federal Civil Procedure Before Trial*, ¶ 9:340 (2001). "[C]ourts have discretion to grant a Rule 12(c) motion with leave to amend." *Id.* ¶ 9:341.

When considering a motion on the pleadings, courts may consider exhibits submitted or referenced in the complaint and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. *See, e.g., Burnett v. Twentieth Century Fox Film Corp.*, 491 F. Supp. 2d 962, 966 (C.D.

United States District Court
For the Northern District of California

Cal. 2007). Indeed, "documents specifically referred to in a complaint, though not physically attached to the pleading, may be considered where authenticity is unquestioned." *Id.* (citing *Daly v. Viacom, Inc.*, 238 F. Supp. 2d 1118, 1121-22 (N.D. Cal. 2002) (considering television program referenced in, but not attached to, complaint).

## DISCUSSION

### I.     Copyright Act claim

Plaintiff alleges copyright infringement by defendants because they "misappropriated copyright protected material from [plaintiff] and made this material available on [their] website." SAC at ¶ 27. A prima facie case of copyright infringement exists because there is no dispute as to plaintiff's ownership of the copyrighted material and defendants' copying of this material. *Hustler Magazine, Inc. v. Moral Majority Inc.*, 796 F.2d 1148, 1151 (9th Cir. 1986). However, defendants argue that plaintiff's claim is barred as a matter of law by the doctrine of fair use, which "permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (internal quotation marks omitted) (alteration in original). Section 107 of the Copyright Act provides that:

> [T]he fair use of a copyrighted work . . . for purposes such as criticism [and] comment . . . is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include –
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

Two cases are particularly relevant to evaluating fair use in the instant case. The *Hustler* case involved a fundraising appeal sent by Moral Majority to thousands of donors. The mailer included a

United States District Court
For the Northern District of California

complete copy of a parody published in Hustler Magazine, used by Moral Majority without Hustler's permission. *See Hustler Magazine*, 796 F.2d at 1150. Although the use was tied to an incontroverted fundraising and political purpose, the Ninth Circuit held that Hustler's copyright infringement claim was barred by the doctrine of fair use. *Id.* at 1152-53, 1156. It found that Moral Majority had not sold the copyrighted work as its own, but had used it for political comment about the plaintiff and to rebut the plaintiff's personal attack. *Id.* at 1153. The court reasoned that individual and institutional defendants may copy such portions of the work as is necessary to allow comprehensible comment in rebutting derogatory information. *Id.* (citing § 107 legislative history, H.R. Rep. No. 94-1474, at 73 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5687). The Ninth Circuit concluded that Moral Majority's copying of the entire parody was reasonably necessary to provide such comment, and held that the public interest in allowing individuals and institutions a defense against derogatory attacks rebuts the presumption of unfairness that otherwise might attach when a use is connected to a commercial purpose. *Id.*

The second case of particular relevance here is *Campbell v. Acuff-Rose Music, Inc.*, in which the Supreme Court considered whether fair use should apply to a situation in which a rap group created a "shocking" parody of the song "Oh, Pretty Woman." *Campbell*, 510 U.S. at 572-73. The Supreme Court held that the defendant's commercial parody, which copied portions of the plaintiff's copyrighted song, constituted fair use. In reaching the decision, it considered whether the new work was "transformative," embodying a different purpose, meaning, or message from the original work. *Id.* at 579. The court recognized transformative works as being "at the heart of the fair use doctrine," such that the commercial purpose of the use was given less weight. *Id.* The defendant's parody was clearly intended to ridicule the original, and the court found it irrelevant to evaluate whether the parody was in bad taste. *Id.* at 582. The court further reasoned that the commercial character of a use does not bar a finding of fairness because many permissible uses, such as comment, criticism, news reporting, and teaching, are done for profit. *Id.* at 584.

The doctrine of fair use is evaluated as a "mixed question of law and fact." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985). However, "[i]f there are no genuine issues of material fact, or if, even after resolving all issues in favor of the opposing party, a reasonable trier

of fact can reach only one conclusion, a court may conclude as a matter of law whether the challenged use qualifies as fair use of the copyrighted work." *Hustler Magazine*, 796 F.2d at 1151; *see, e.g., Fisher v. Dees*, 794 F.2d 432, 435-36 (9th Cir. 1986) (finding fair use where the operative facts were undisputed or assumed; the court is to make fair use judgments, which "are legal in nature"); *Leadsinger, Inc., v. BMG Music Pub.*, 512 F.3d 522, 530 (9th Cir. 2008).

All fair use factors must be explored and weighed together, not in isolation, while considering the purposes of the Copyright Act. *Campbell*, 510 U.S. at 578. Morever, the scope of fair use is broader when the information relayed involves issues of concern to the public. *Harper & Row Publishers*, 471 U.S. at 555-56. The Court evaluates the parties' arguments on each of these four fair use factors and weighs the factors below.

### A.    The purpose and character of the use

Defendants argue that the first factor favors the application of the fair use doctrine because there is no dispute that the purpose and character of their use of the copyrighted materials was a form of public criticism and commentary protected by the Copyright Act. Plaintiff argues that the fair use defense is inapplicable to defendants' usage of, and comment on, segments of the copyrighted audio work because defendants' "infringement was not done for genuine criticism or comment," but instead misrepresented plaintiff's views with the intention to raise funds for their own political purposes as "a foreign agent for international terror" under the guise of a non-profit, civil rights group. Plaintiff's Opposition at 5-7; *see* SAC at ¶¶ 24, 28-30, 32. Plaintiff asserts that these alleged motives behind the usage and comment are fatal to defendants' fair use defense because fair use presupposes good faith and fair dealing.

The first fair use factor examines the "purpose and character of the use," considering whether the character of the use is criticism and commentary and weighing, for instance, the "commercial or nonprofit purpose of the use." *See* 17 U.S.C. § 107(1). The use of copyrighted work for a commercial purpose is presumptively unfair. *Hustler Magazine,* 796 F.2d at 1152. However, "[s]ection 107 expressly permits fair use for the purposes of criticism and commentary." *Id.* at 1153. In addition, the Supreme Court has recognized that commentary and criticism "traditionally have had a claim to fair use

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

protection." *Campbell*, 510 U.S. at 583. Therefore, "[e]ven assuming that the use had a purely commercial purpose, the presumption of unfairness can be rebutted by the characteristics of the use." *Hustler Magazine,* 796 F.2d at 1152-53.

Plaintiff tries to conflate "motive" with the purpose and character of the use, which is not permitted by the case law. Rather, even assuming the truth of plaintiff's allegations about motive, it is the manner of use, not the motivation behind it, which must be analyzed: "what use was made," rather than "who is the user." Defendants' Reply at 3.

Plaintiff places primary reliance on the Supreme Court's reasoning in *Harper and Row*, but it does not go so far as plaintiff contends. The *Harper and Row* court recognized that fair use presupposes good faith and fair dealing in the manner in which the copyrighted work was obtained by the defendant. *Harper & Row Publishers*, 471 U.S. at 562-63. Accordingly, in evaluating the "character of the use" aspect of the first factor, the court found relevant "the propriety of the defendant's conduct." *Id.* The court found that by "exploiting a purloined manuscript" before the plaintiff had a chance to publish it, the defendants had arrogated to themselves the valuable commercial right of first publication, which weighed against a finding of fair use. *Id.* The Supreme Court's good faith inquiry concerned how the original work was obtained, not the motive behind the use. *See id.* Here, plaintiff does not claim that the audio segments were not obtained in good faith, but alleges only that defendants' motives are improper. In fact, plaintiff was the first to publicly broadcast the excerpts used by defendants, making the work readily accessible to anyone. Unlike *Harper*, there can be no claim of theft in obtaining the excerpts or destroying plaintiff's right of first publication here. Defendants obtained the audio segments just as the general public would, and plaintiff's arguments as to defendants' alleged motives are not relevant to evaluating this factor.

Morever, *Hustler* held as fair use the defendants' distributing of plaintiff's entire parody, despite the political purposes served by the defendants' use. *Hustler Magazine,* 796 F.2d at 1153. Protection under the doctrine of fair use extends to those with a political purpose, even those engaged in fundraising activities. Thus plaintiff's allegation that defendants placed the link to the plaintiff's audio excerpt near a donate button on defendants' web page does not vitiate fair use, where defendants' use

7

of the audio excerpt called attention to plaintiff's statements to raise funds from defendants' supporters, by providing criticism and comment. *Hustler Magazine*, 796 F.2d at 1152-3, 1156; *Campbell*, 510 U.S. at 571-72, 584; *see also Lennon v. Premise Media Corp.*, ___ F. Supp. 2d ___, 2008 WL 2262631, at *8 (S.D.N.Y. June 2, 2008) (balance of factors clearly favors finding of fair use where defendants used an excerpt from the John Lennon song "Imagine" in order to critique the lyrics contained in that excerpt).

Plaintiff has made no allegation that defendants used plaintiff's work for anything other than criticism of or comment on plaintiff's views; rather, the complaint affirmatively asserts that the purpose and character of defendants' use of the limited excerpts from the radio show was to criticize publicly the anti-Muslim message of those excerpts. *See* SAC at ¶¶ 26, 28, 32, 42. To comment on plaintiff's statements without reference or citation to them would not only render defendants' criticism less reliable, but be unfair to plaintiff. Further, it was not unreasonable for defendants to provide the actual audio excerpts, since they reaffirmed the authenticity of the criticized statements and provided the audience with the tone and manner in which plaintiff made the statements.

For all of these reasons, the Court finds that defendants used plaintiff's material in order to criticize and comment on plaintiff's statements and views. These facts are uncontested, and the Court finds that this factor weighs heavily in favor of defendants.

## B.     The nature of the copyrighted work

The work at issue is part of a radio talk show about public affairs. Defendants argue that, as a result, the law affords it less copyright protection, because the content of the work is more informational than creative. Plaintiff opposes by pointing to his allegations that his show is a performance with "value beyond the words and ideas conveyed," Plaintiff's Opposition at 7-8, which he compares to "live theater . . . or other genres where a performer combines social commentary with powerful performance," SAC at ¶¶ 3-4.

The second fair use factor considers the nature of the copyrighted work at issue. 17 U.S.C. § 107(2). In evaluating this factor, courts have considered creative works to be "closer to the core of

8

intended copyright protection" than "informational" works. *Campbell*, 510 U.S. at 586; *Hustler Magazine*, 796 F.2d at 1153-54. In *Hustler*, the Ninth Circuit considered "whether the work is imaginative and original, or whether it represented a substantial investment of time and labor made in anticipation of financial return." *Hustler Magazine*, 796 F.2d at 1154. Because the audio excerpts come from a call-in radio talk show, the original work at issue appears to be more informational than creative. It is reasonable to believe that plaintiff did not anticipate a future sale of, or future market for, the content arising from his comments made on a call-in show. Further, it would be difficult to reasonably construe plaintiff's on-air comments regarding Muslims, Islam, and CAIR as fiction or fantasy, which copyright law distinguishes from factual works. *Harper & Row Publishers*, 471 U.S. at 563 ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy."). However, at this stage of the litigation, the Court must assume the truth of plaintiff's allegation that his work is a creative performance. Therefore, the Court finds that this factor weighs slightly in plaintiff's favor.

### C. The amount and substantiality of the portion used

Defendants argue that the amount and substantiality factor favors the fair use defense because, as plaintiff alleges, defendants used a portion "in excess of four minutes" of the two hour radio talk show. However, plaintiff argues that "the relationship of the material used by defendants to the totality of the performance cannot be decided on the pleadings" because the copied portion of the two-hour show constitutes a distinct work like a separate song on a CD and, therefore, there is a fact issue as to whether the amount copied in relation to the whole is unreasonable. Plaintiff's Opposition at 8.

This factor evaluates "the amount and substantiality of the portion used in relation to the copyright as a whole." 17 U.S.C. § 107(3). This factor looks to the quantity and significance of the material used to determine whether the use is reasonably necessary to accomplish the purpose of the defendant's work and whether it supersedes or constitutes the heart of the original work. *Campbell*, 510 U.S. at 586-87. In addition, the Supreme Court has considered the persuasiveness of the critic's justification for the copying based on the first fair use factor, because the Court recognizes that the

extent of permissible copying varies with the purpose and character of the use. *Id.* Even substantial quotations may constitute fair use in commenting on a published work. *Harper & Row Publishers*, 471 U.S. at 564. For example, "an individual in rebutting a copyrighted work containing derogatory information about himself may copy such parts of the work as are necessary to permit understandable comment." *Hustler Magazine*, 796 F.2d at 1153 (held as fair use defendants' copying of the entire parody to rebut the parody's derogatory message about a defendant because the use was necessary to provide understandable comment).

Plaintiff argues that the amount and substantiality of the audio excerpt constitutes the heart of the original work because it is substantial in relation to incremental segments of the program, which by themselves should constitute separate original works. It should first be noted that this claim is inconsistent with various allegations in the complaint, such as the assertion that CAIR's "repackaging damaged the work and damaged the public image of the work because it was taken out of context . . . of 'The Savage Nation' . . . ," SAC at ¶ 31, and that defendants did not use the excerpt in "the context of the statement and it is not consistent with the content of the programming as a whole," *id.* at ¶ 32. In any event, however, defendants persuasively argue that plaintiff is barred from asserting that the audio excerpts should be compared to incremental portions as opposed to the entire two-hour show because plaintiff had registered the October 29, 2007 episode as a whole work. Defendants' Reply at 6 n.6 (citing Melville and Nimmer, Nimmer on Copyright § 13.05[A][3]); *see* Copyright Registration Number SR0000610214. For these reasons, plaintiff's admission that the excerpt is roughly four minutes out of a two hour show strongly suggests that the amount used was small in relation to the entire talk show program on October 29, 2007.

Further, even assuming as true plaintiff's allegation that incremental portions or segments of the show constitute separate copyrightable works, and accepting plaintiff's argument that the audio excerpts used should be compared to these portions in analyzing the amount and substantiality factor, plaintiff's contention that this factor should weigh in his favor fails as a matter of law. As discussed in the Court's analysis of the first fair use factor, defendants used the audio excerpts to comment on and rebut derogatory statements regarding their organization and their religious affiliations, and the amount used

10

**United States District Court**
For the Northern District of California

in reference to plaintiff's statements was reasonably necessary to convey the extent of plaintiff's comments. As a result, regardless of whether the entire October 29, 2007 program or segments of that program constitute the entire original work for analysis under this factor, the extent of defendants' copying of the audio excerpts falls within the fair use doctrine. *Hustler Magazine*, 796 F.2d at 1153. Therefore, the Court finds that the amount and substantiality of material used in comparison to the original work favors the application of fair use under the third factor.

> **D.    The effect of the use upon the potential market for or value of the copyrighted work**

The fourth factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Evaluation of this factor considers both the extent of the market harm caused by the alleged infringer's conduct and the adverse impact on the potential market for the original if this conduct were unrestricted. *Campbell*, 510 U.S. at 590; *Harper & Row Publishers*, 471 U.S. at 568. The Ninth Circuit has provided that "in determining whether the use has harmed the work's value or market, the courts have focused on whether the infringing use: (1) tends to diminish or prejudice the potential sale of the work; or (2) tends to interfere with the marketability of the work; or (3) fulfills the demand for the original work." *Hustler Magazine*, 796 F.2d at 1155-56 (internal citations and quotations omitted). In addition, the Supreme Court has held that critique or commentary of the original work, such as a parody, that kills demand for the original by force of its criticism, rather than by supplying the demands of the market, does not create a cognizable harm under the Copyright Act. *Campbell*, 510 U.S. at 591-92. The role of the courts is to distinguish between criticism that decreases demand and copyright infringement that essentially eliminates it by market substitution. *Id.* at 592. Furthermore, the Ninth Circuit has noted that "[a] use that has no effect upon the market for, and value of, the work need not be prohibited in order to protect the author's incentive to create." *Hustler Magazine*, 796 F.2d at 1155 (internal quotation marks omitted) (alteration in original). Therefore, the scope of fair use includes "copying by others which does not materially impair the marketability of the work which is copied." *Id.* This last factor is the most important factor of the fair use defense. *Id.*

Defendants argue that their usage did not damage the market value of the original work. The complaint merely asserts, without more, that defendants' usage "damaged the work and damaged the public image of the work." SAC at ¶ 31. However, plaintiff fails to allege or suggest an impact on the actual or potential sale, marketability, or demand for the original, copyrighted work. There is no suggestion that plaintiff currently has, or ever had, any kind of market for the copyrighted work at issue outside its airing on the October 29, 2007 radio show. Further, he does not allege any attempts or plans to sell or license the material or derivatives thereof.[2] Plaintiff instead alleges that defendants caused him financial loss in advertising revenue. Assuming the truth of this allegation, it relates only to the economic impact on future shows, and has no impact on the market for the original, copyrighted show on October 29, 2007. Because this factor limits the evaluation of market impact to the *original* work at issue, not other works by the creator, the loss of advertising revenue for future shows, unrelated to the original work, does not give rise to a legal cognizable infringement claim. *Campbell*, 510 U.S. at 590. Allegations of this sort have been squarely rejected by the Supreme Court. *Id.* at 591-92.

Plaintiff alleges that defendants "destroyed [the] value of the copyright material and performance as a whole, *to the extent that people gave credence to the CAIR repackaging of the content*." SAC at ¶ 35 (emphasis added). Thus, plaintiff admits that the effect of defendants' usage is limited to the public criticism and condemnation of the ideas within the original work, not market damage in the economic sense. For example, the posting and criticizing of the audio segment on defendants' website does not promote fundraising to the detriment of plaintiff's potential revenue on the original work. The audience that might donate and listen to the audio segment on defendants' website is separate from the audience that plaintiff possibly could stand to profit from in using his website to sell the audio content at issue. Likewise, plaintiff's allegation that defendants repackaged the original, misportraying its meaning and message, creates a presumption that the work is transformative. *See Campbell*, 510 U.S. at 579, 591-92 (reasoning that a new work that has a different purpose, meaning, or message than the original work is

---

[2] Any potential claims on the market impact of derivative works are barred as a matter of law because "there is no protectible derivative market for criticism" and impairing such a market by the effectiveness of critical commentary is not relevant under copyright law. *Campbell*, 510 U.S. at 592-93.

12

transformative). Because the use of the audio excerpts serves a different function, it cannot supercede the original as a market substitute. *See id.* at 591-92. As a result, the sum of plaintiff's allegations and evidence demonstrate that there will be no actual or potential market impact on the original work, and the Court finds the fourth factor strongly favors defendants.

### E.    Conclusion re: copyright claims

Assuming all of plaintiff's allegations are true, the Court finds that the majority of the four fair use factors, including the most important factors, weigh in favor of defendants. Accordingly, the Court finds that fair use applies, and GRANTS defendants' motion for judgment on the pleadings as to plaintiff's copyright infringement claims as a matter of law. Because the Court finds that the defects of plaintiff's Second Amended Complaint will not be cured by amendment, plaintiff's copyright claim is dismissed without leave to amend.

### II.    Civil RICO Claim

Defendants also assert that plaintiff has failed to state a claim for civil RICO. Plaintiff has made essentially these allegations: (1) defendants have received and made donations to terrorist affiliated groups and foreign parties; (2) defendants have had founders and officers who have been affiliated, or held positions, within groups alleged to be related to the Hamas terrorist group; (3) defendants have a goal of furthering a common agenda through the conduct of providing material support to terrorist groups by filing lawsuits and creating propaganda to discourage those who oppose their goals, by soliciting donations to certain terrorist-affiliated organizations, and by using the alleged copyright infringement to support these efforts; and (4) through this conduct, defendants have participated in a terrorist enterprise and conspiracy.

Defendants urge (and plaintiff rejects) four independent reasons why the Court should grant judgment on the pleadings: (1) plaintiff has no standing because he has not alleged an injury resulting from defendant's conduct; (2) plaintiff has failed to identify the RICO statutes upon which he relies and has failed to meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(c) for

13

racketeering claims predicated on fraud; (3) plaintiff has failed to allege an association-in-fact enterprise with the necessary shared purpose; and (4) even if plaintiff could show some injury as a result of defendant's alleged conduct, plaintiff has not pled that defendant's conduct proximately caused any injuries to plaintiff. Defendants also argue that plaintiff's entire complaint should be dismissed pursuant to the First Amendment.

To state a civil RICO claim, plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing injury to plaintiff's 'business or property.'" *Ove v. Gwinn*, 264 F.3d 817, 825 (9th Cir. 2001) (quoting 18 U.S.C. § 1964(c)).

### A.     First Amendment defenses

As an initial matter, plaintiff's RICO claim raises serious First Amendment concerns. Nearly all – and quite possibly all – of defendants' activities that trouble plaintiff and serve as the basis for defendants' alleged involvement in a RICO conspiracy are related to speech and thus may have First Amendment protection. Plaintiff alleges that defendants have engaged in the filing of lawsuits, the writing of letters, the organizing of boycotts, and the criticism of plaintiff himself on their website. SAC at ¶¶ 44-55. Putting aside the terrorist activities of other organizations not before the Court, the gravamen of plaintiff's dispute is with the ideas that defendants may or may not espouse. As plaintiff should no doubt be aware, this is fertile First Amendment territory, all the more so because the only one of defendants' actions that connects plaintiff in any way to the alleged RICO conspiracy – and thus potentially gives him standing to bring a RICO claim – is defendants' use of a four-minute audio clip of plaintiff's radio program on their website.

The First Amendment bears heavily on plaintiff's RICO allegations in two ways. First, the First Amendment bestows broad immunity on defendants for their liability arising from the filing of lawsuits or other petitions to the government. "The Supreme Court has long recognized that for the Petition Clause [of the First Amendment] to be a meaningful protection of the democratic process, citizens must be immune from some forms of liability for their efforts to persuade government officials to adopt policy or perform their functions in a certain way." *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1059 (9th Cir.

14

1998).  This doctrine is referred to as the *Noerr-Pennington* doctrine, which has its origins in the Supreme Court's decision that a party could be immune from liability under the Sherman Act for efforts to influence the legislative or executive branches of government.  *See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).  More recently, the Supreme Court expanded the *Noerr-Pennington* doctrine to protect petitioning activities before the judicial branch of government, holding that "[t]he right of access to the courts is indeed but one aspect of the right of petition."  *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).  "We conclude that it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view . . . ."  *Id.* at 510-11.  Moreover, the *Noerr-Pennington* doctrine has been applied to other federal laws beyond those involving antitrust violations, including the RICO Act.  *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 930 (9th Cir. 2006) (applying the *Noerr-Pennington* doctrine to a civil RICO claim and explaining that "[r]ecognizing the constitutional foundation of the doctrine, the Supreme Court has applied *Noerr-Pennington* principles outside the antitrust field"); *Marina Point Dev. Assocs. v. United States*, 364 F. Supp. 2d 1144 (C.D. Cal. 2005) (applying doctrine to civil RICO claim).

In short, the Supreme Court and the Ninth Circuit have made clear that the First Amendment may be used as a shield to protect those engaged in "petitioning" in the form of civil lawsuits and pre-litigation demand letters.  *See DIRECTV*, 437 F.3d at 939.  Here, much of plaintiff's RICO claim is based on defendants' involvement in the filing of lawsuits or the threat of lawsuits.  SAC at ¶¶ 47, 50-52, 54.  To the extent the actions complained of involve defendants' filing of lawsuits and amicus briefs, the Court finds that defendants are entitled to *Noerr-Pennington* protection.  The Court further finds that plaintiff's complaint makes no suggestion that these lawsuits would fall under the "sham exception" to the *Noerr-Pennington* doctrine because there is no suggestion that defendants did not have genuine desire to seek judicial relief.  *Or. Natural Resources Council v. Mohla*, 944 F.2d at 531, 534-35 (9th Cir. 1991) (explaining the application of the sham exception to the filing of lawsuits).  Accordingly, plaintiff's RICO claim may not be sustained on the basis of lawsuits and pre-litigation demand letters.

15

United States District Court
For the Northern District of California

*See DIRECTV*, 437 F.3d at 942 ("[W]e hold that RICO and the predicate statutes at issue here do not permit the maintenance of a lawsuit for the sending of a prelitigation demand to settle legal claims that do not amount to a sham."); *Marina Point Dev.* , 364 F. Supp. 2d at 1149 (Defendant's "motion to dismiss the [civil RICO] action with prejudice for failure to state a claim pursuant to [Rule] 12(b)(6) is granted because she is immune from liability under the First Amendment's *Noerr-Pennington* doctrine.").

Plaintiff's claimed injury also implicates the First Amendment.  The only action by defendants which plaintiff contends confers standing on him to bring his RICO claim is defendants' decision to post a four-minute audio clip of plaintiff on their website in the context of criticizing plaintiff's views. Although the Supreme Court has not extended the *Noerr-Pennington* doctrine to speech-related activities other than petitioning, the doctrine demonstrates that defendants may use the First Amendment as a shield to defend against claims alleging antitrust and civil RICO violations, in addition to the usual cases involving state law claims for libel, defamation, false light, invasion of privacy, and the like. *See*, *e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).  Indeed, Justices Souter and Kennedy have warned of the danger presented by "harassing RICO suits" and the importance of the First Amendment in preventing such harassment.  *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 264 (1994) (Souter, J., concurring).  Those justices stated that it is "prudent to notice that RICO actions could deter protected advocacy and to caution courts applying RICO to bear in mind the First Amendment interests that could be at stake." *Id.* at 265.  Justices Souter and Kennedy also explained that

> legitimate free-speech claims may be raised and addressed in individual RICO cases as they arise.  Accordingly, it is important to stress that nothing in the Court's opinion precludes a RICO defendant from raising the First Amendment in its defense in a particular case. Conduct alleged to amount to Hobbs Act extortion, for example, or one of the other, somewhat elastic RICO predicate acts may turn out to be fully protected First Amendment activity, entitling the defendant to dismissal on that basis.

*Id.* at 264.  Other courts have agreed that there would be "grave concerns were . . . defendants held liable under civil RICO for engaging in the expression of dissenting political opinions in a manner protected under the First Amendment." *Ne. Women's Center, Inc. v. McMonagle*, 868 F.2d 1342, 1348 (3d Cir. 1989) (finding that forcible entry into abortion clinic and destruction of medical equipment "establishes that the jury found that Defendants' actions went beyond mere dissent and publication of their political

16

views").

Plaintiff's complaint appears to raise precisely the First Amendment problems in the RICO context recognized by Justices Souter and Kennedy and the Third Circuit. Even assuming the truth of plaintiff's alarming allegations that defendants are engaged in a worldwide RICO conspiracy with terrorist organizations, plaintiff's only connection to this conspiracy, for purposes of Article III standing, is the injury he allegedly received when defendants made available a portion of his radio show on their website and criticized his views, thus causing plaintiff's advertising revenue to decrease when some of his advertisers decided they could no longer support his show. Plaintiff's injury is entirely founded upon defendants' speech-related activities. It appears beyond dispute that plaintiff is a public figure and that plaintiff was discussing matters of public concern when he discussed the role of Islam in the United States and whether those of Islamic faith should be permitted to emigrate here. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 772-75 (1986) (discussing *New York Times* and other First Amendment cases). Thus, for defendants' speech to amount to "injury" against plaintiff, for purposes of RICO and Article III standing, plaintiff would have to show with "convincing clarity," *New York Times*, 276 U.S. at 285-86, that defendants' allegedly injurious false statement or portrayal of plaintiff's own speech was done "with actual malice – that is, with knowledge that it was false or with reckless disregard of whether it was false or not," *id.* at 280 (internal quotation marks omitted); *see also Philadelphia Newspapers*, 475 U.S. at 773. This plaintiff has not even attempted to do or allege.

## B.    Standing and proximate cause

As discussed above, plaintiff's standing depends entirely on actions taken by defendants that may be entitled to First Amendment protection. In addition to this First Amendment problem, plaintiff has not alleged a required cognizable injury or proximate cause. Plaintiff's only allegation of injury to his business and/or property interests is that defendants inflicted damage to the value of the copyright through "the misportrayal of the meaning of the performance." Plaintiff's Opposition at 16-17; *see also* SAC ¶ 37. Plaintiff fails to raise any other arguments or allegations that would confer standing through a cognizable injury. *See* Plaintiff's Opposition at 16-17.

17

**United States District Court**
For the Northern District of California

There are both constitutional and prudential dimensions to the standing question. The constitutional prerequisites to standing are (1) an injury in fact which is concrete and not conjectural; (2) a causal connection between the injury and defendant's conduct or omissions; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The prudential limitations require (1) that the plaintiff's claim must fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question; (2) that the claim must be for injury to the plaintiff's own legal rights and interests, rather than the legal rights and interests of third parties; and (3) that the injury be individualized or confined to a discrete group as opposed to a generalized grievance. *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State*, 454 U.S. 464, 474-75 (1982).

In order for a plaintiff to have standing to sue under civil RICO, there must be a showing (1) that the plaintiff was injured and (2) that the defendant's conduct that constitutes a RICO violation must be the proximate cause of the plaintiff's injury at issue. *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 268-69 (1992). To show an injury under RICO, a plaintiff must show a concrete financial loss and not mere injury to a valuable intangible property interest. *Oscar v. Univ. Students Coop. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992); *Fireman's Fund Ins. Co. v. Stites*, 258 F.3d 1016, 1021 (9th Cir. 2001). The Supreme Court has stated that there must be "some direct relation between the injury asserted and the injurious conduct alleged. Thus, a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover." *Holmes*, 503 U.S. at 268-69; *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.")

The only connection between plaintiff and the RICO conspiracy he alleges is that plaintiff's copyright interests were injured when defendants "repackaged and damaged" his work.[3] As determined

---

[3] Plaintiff asserts the following RICO predicate acts: (1) conspiracy to commit murder; (2) conspiracy to commit arson; (3) fraud with identification documents; (4) mail fraud; (5) wire fraud; (6) financial institutional fraud; (7) illegal transactions in monetary instruments; (8) money laundering; (9) defrauding the U.S. government; (10) violation of the Travel Act; (11) filing false or materially false

18

above, however, defendants' usage of an audio segment of plaintiff's work is protected under the fair use doctrine as a matter of law. As a result, since the Court finds no copyright infringement, plaintiff has not properly asserted that he has suffered an injury to his business or property related to any of defendants' activities. *Anza*, 547 U.S. at 457. Therefore, the Court finds that plaintiff lacks standing to bring his civil RICO claim and has failed to allege proximate cause. Failure to meet these required elements is fatal to plaintiff's civil RICO claim.

### C.    Pleading requirements for racketeering claims

Defendants also argue that plaintiff's pleading is deficient for a number of reasons. The Court agrees. As to all alleged predicate acts that sound in fraud, particularly regarding defendants' solicitations of donations on their website to other organizations, plaintiff fails to meet the heightened pleading requirements in specifically alleging the time and place of the misrepresentation, manner of misrepresentation, and parties to the misrepresentation. *See* Fed. R. Civ. P. 9(b); *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986) (plaintiff "must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation") (internal quotation marks omitted).

In addition, the Court finds that plaintiff's Second Amended Complaint is similar to the complaint at issue in *Pelletier v. Zweifel*, 921 F.2d 1465, 1518-19 (11th Cir. 1991), in which the Eleventh Circuit affirmed the district court's dismissal of a RICO claim because it was brought to harass the defendant and constituted "shotgun" pleadings that made it extremely difficult for the court and opposing parties to identify the facts that would give rise to a cognizable claim, *id.* at 1518 (noting that defendant and "the district court had to sift through the facts presented and decide for themselves which were material to the particular cause of action asserted, a difficult and laborious task indeed"). Plaintiff alleges that defendants are part of a criminal terrorist conspiracy, but makes only conclusory allegations

---

tax returns; (12) engaging in corrupt endeavor to impede and impair the due administration of the internal revenue laws; (13) providing material support of terrorism; and (14) criminal infringement of copyright.

19

lacking factual support. He sets forth a redundant narrative of allegations and conclusions of law, but makes no attempt to allege what facts are material to his claims under the RICO statute, or which facts are used to support what claims under particular subsections of RICO. For these reasons, the Court finds that plaintiff's complaint fails to meet the Rule 9 particularity requirement for averments of fraud, and also fails to meet the Rule 8 requirement of a short and plain statement that puts forth the grounds for relief and provides defendants with notice of the claims against them. These defects require dismissal of plaintiff's RICO claim.

### D.    Association-in-fact enterprise

Defendant challenges plaintiff's "enterprise" allegations. Plaintiff alleges that defendants are part of a conspiracy that operates by "dividing into cells with each cell helping the other but each cell maintaining a separate identity." Plaintiff's Opposition at 20.

An enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has identified a RICO enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). The Ninth Circuit recently held that to meet the "enterprise" element of a RICO claim, a plaintiff must allege facts that will demonstrate (1) that defendant has "associated for a common purpose of engaging in a course of conduct"; (2) that there is an "ongoing organization either formal or informal" which "is a vehicle for the commission of two or more predicate crimes"; and (3) "that the various units function as a continuing unit," meaning that the "associates' behavior was ongoing rather than isolated activity." *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th. Cir. 2007) (en banc).

For the purposes of this motion, the Court must accept plaintiff's allegations as true, and therefore finds that plaintiff has alleged facts sufficient to meet the "enterprise" element.

### E.    Conclusion re: RICO claims

The Court GRANTS defendants' motion for judgment on the pleadings as to plaintiff's RICO

20

United States District Court
For the Northern District of California

claim because plaintiff lacks Article III standing, has not pled proximate cause, and has filed a complaint that does not comply with the pleading requirements of the Federal Rules of Civil Procedure. The Court will grant plaintiff leave to amend the RICO portion of his complaint.

## CONCLUSION

The Court GRANTS defendants' motion for judgment on the pleadings [Docket No. 12]. Plaintiff's copyright claim is dismissed without leave to amend. Plaintiff must amend his civil RICO claim, should he wish to do so, by **August 15, 2008.** If plaintiff files an amended complaint, the Court will reschedule a case management conference as needed.

**IT IS SO ORDERED.**

Dated: July 25, 2008

SUSAN ILLSTON
United States District Judge